KINTNER et al. v. ATLANTIC COMMUNICATION CO. et al.

(District Court, S. D. New York.   November 19, 1917.)

1. PATENTS ⬛➡328—VALIDITY AND INFRINGEMENT—WIRELESS TELEGRAPHY.

The Fessenden reissue patent, No. 12,168 (original No. 706,737), for improvements in transmission of energy by electromagnetic waves, claims 2, 3, 10, 15, 16, and 17, for a sending conductor, are within the original specification, and first disclosed clearly and definitely a system of continuous generation, and such disclosure involved invention.   Such claims also *held* infringed.   Claims 19, 20, and 21, for a system of transmission, are void as too broad.

2. PATENTS ⬛➡170—CONSTRUCTION AND SCOPE—STATE OF THE ART.

An inventor is entitled to all the benefits of his invention, notwithstanding the fact that he may not have fully appreciated those advantages, especially in the early stages of an extremely difficult art.

3. PATENTS ⬛➡170—VALIDITY—STATE OF THE ART.

Where, when an application was filed, the art was new, and some of its definitions and phraseology were still in the making, and where it is apparent that the patentee was not endeavoring to utilize after-acquired knowledge, courts should not be astute to find obstacles against the inventor.

In Equity.   Suit by Samuel M. Kintner and Halsey M. Barrett, receivers of the National Electric Signaling Company, against the Atlantic Communication Company and others.   On final hearing.   Decree for complainants.

Suit for infringement of claims 2, 3, 10, 14, 15, 16, 17, 19, 20, and 21 of reissued letters patent No. 12,168, to Reginald A. Fessenden, dated November 10, 1903, the original patent No. 706,737, being dated August 12, 1902, and the application for reissue having been filed October 20, 1903.

Frederick W. Winter, of Pittsburgh, Pa., and Drury W. Cooper, of New York City, for plaintiffs.

Charles Neave and Harry E. Knight, both of New York City, and Hervey S. Knight, of Washington, D. C., for defendants.

MAYER, District Judge.   This is the usual patent infringement suit, the defenses relied upon being invalidity and noninfringement. Two grounds of invalidity are urged:  (1) Noninvention; and (2) that the subject-matter of the claims was injected into the application after the original date of filing, and therefore constitutes an invalid enlargement of the application.

[1] Noninfringement is urged on the ground that defendants do not use instrumentalities coming within the claims in issue, when interpreted as defendants insist they must be.   The subject-matter of the patent is addressed to the transmission of energy by electromagnetic waves.   The patentee states:

"The invention described herein relates to certain improvements in transmission of energy by electromagnetic waves, and has for its object the production of more efficient sending or generating conductors.   It is a further object of the invention to provide for the production of mechanical movements

by the direct interaction of currents induced in the receiving conductor by electromagnetic waves and constant or varying magnetic fields."

"In the experiments heretofore made in wireless transmission of energy, as in telegraphy, relatively high frequencies—e. g., of the order of 2,000,000 periods or more per second—have been used. It is impossible to produce or utilize mechanical movements directly by the interaction of a constant or independently varying magnectic field and a current induced by electromagnetic waves of such high periodicities, for the reason that either the element to be moved (as the diaphragm of a telephone) is incapable of such rapid vibrations or the vibrations are too rapid to be utilized. In order to utilize directly the interaction between currents induced by electromagnetic waves and a constant or independently varying magnetic field to produce motion in one of two members, of a receiving instrument, one member thereof, consisting of a contant or independently varying magnetic field, the sending conductor is so constructed that its capacity or self-induction, or both, are large as compared with the value of the aerial wire commonly used in the art and distributed with practical uniformity along the conductor from or near its top to a point at or near the instrument. By thus increasing the capacity and self-induction of either of them, the frequency of the electric oscillations in the conductors, and consequently of the waves generated, will be sufficiently low to produce utilizable motion in the instrument. By 'low frequency' is meant low relative to the frequency hitherto used in wireless telegraphy."

The claims fall into two groups, the first of which relates to the "sending conductor" and the second to a "system," in which continuous electromagnetic waves are radiated for the transmission of energy. In the first group are claims 2, 3, 10, 15, 16, and 17, and in the second group are claims 19, 20, and 21. Claims 2 and 19 are quoted as substantially typical of the two groups.

"2. A sending conductor for electromagnetic waves, having its capacity so adjusted that the waves radiated therefrom have a low frequency, substantially as set forth."

"19. A system for transmission of energy by electromagnetic waves in combination with a radiating conductor and a source of alternating electrical energy or potential, said radiating conductor and source being co-ordinated and relatively adjusted to radiate a substantially continuous stream of electromagnetic waves."

Apparently there is no attack on the reissue as such, but defendants attack the original patent on the ground that there was an unwarranted departure from the disclosure in the application as originally filed. The changes (many of which were evoked by discussions with and the action of the Patent Office examiner) are too numerous to analyze in detail. The contentions of defendants as to the interpretation of the patent are concisely stated as follows:

"The only teachings that could possibly be gathered from the Fessenden specification, as originally filed, were:

"Ia. A sending conductor, identified as—(1) The antenna or radiating part of a transmitting system. (2) Having its constants adjusted to transmit frequencies receivable mechanically and therefore audio frequencies. (3) Having 'a source of alternating voltage' directly connected therewith, and delivering its original frequency directly thereto, without use of a spark device, stepping up device, or other intervening oscillation producing device; the old form of induction coil (with its current interrupter) or else the dynamo or the transformer were recognized by him as equivalent for all results then conceived of.

"Ib. That on May 29, 1901 (the filing date), Fessenden had not the slightest thought of teaching the existence of, or any manner of advantage in—(4) Substantially continuous radiation, or waves of uniform strength, or any

manner of advantage in the characteristic output of a dynamo per se or any difference between a dynamo, as the source, and well-known damped wave sources such as an induction coil (which always has a vibrator) or a transformer having its primary supplied from any source (including direct current sources acting through a Wehnelt interrupter or the usual induction coil)."

The application as originally filed illustrated and described a dynamo connected directly to the aerial. The specification mentioned only one numerical value of the frequency, to wit, a frequency of 100,000 or less. The original specification also stated that:

"The best results are obtained when the frequency of the source of alternating voltage, as a dynamo, is equal or approximately equal to the natural frequency of the radiating system."

The evidence warrants the conclusion that a 100,000-cycle alternator, or an alternator of any other frequency, directly connected to the antenna as shown in Figs. 1 and 2 of the patent, with the alternator frequency equal or approximately equal to the natural frequency of the radiating system, will produce a continuous electromagnetic wave having a frequency equal to that of the alternator, and of constant amplitude.

It is true that in referring to the "exciting generator" Fessenden did not limit himself to a dynamo; for he said: "As, for example, the exciting generator may be a dynamo, a transformer, or an induction coil. * * *" It is, however, immaterial whether or not Fessenden placed his strongest emphasis on the dynamo. The evidence, in my opinion, warrants the belief that Fessenden fully appreciated the value of the dynamo in his combination as one of the elements by means of which the desired continuous or sustained waves could be attained. But whether or not this conclusion is correct is again immaterial, because the point is that Fessenden disclosed to the man skilled in the art, the means of obtaining the result, to wit, continuous generation.

[2] An inventor, of course, is entitled to all the benefits of his invention, notwithstanding the fact that he may not have fully appreciated those advantages, especially in the early stages of an extremely difficult art.

[3] It must not be forgotten that, when this application was filed, the art was young, and some of its definitions and phraseology were still in the making, and where, as here, it is apparent that the patentee was not endeavoring to utilize after-acquired knowledge (as in Kintner v. Atlantic Communication Co. [D. C.] 230 Fed. 829, affirmed 240 Fed. 716, 153 C. C. A. 514), courts should not be astute to find obstacles against the inventor.

In part answer to the contentions of defendants, as quoted supra, it appears that in the original specification the conductor was described as a "generating conductor." This was changed to "sending conductor," and supplemented by a definition consistent with "generating" conductor as follows:

a "The terms 'sending conductor' and 'receiving conductor,' as hereinafter employed, indicate all of the circuits of the sending and receiving stations from top to ground, * * * including all apparatus in series with the circuits, while the term 'radiating portion' indicates substantially all of the

sending conductor from top or extreme end of same to a point at or near junction with the apparatus for effecting the oscillatory charging and discharging thereof, such as sparking terminals, transformer coils, armature windings, etc."

Since claims 2, 3, 15, 16, and 17 are drawn explicitly to a "sending conductor," they must be read to mean what the specification defines to be the sending conductor, and cannot be construed to cover merely the radiating portion or aerial. In other words, they must be read to include, not only the aerial, but all of the sending circuits, including the generator. In effect, they mean a sending or generating system having the necessary high capacity, small inductance, and low resistance, to radiate waves of low frequency. Further, the disclosure was not limited to audio frequencies, but broadly to "transmission of energy by electromagnetic waves."

As to the criticism in respect of Fessenden's lack of appreciation of the characteristic output of a dynamo, it has already been shown that he clearly indicated that a dynamo could or should be used. It is immaterial that a dynamo producing frequencies of 100,000 or less was not then in existence. Fessenden believed that such a dynamo could be constructed; he pointed out that it was part of his system, and, as matter of fact, he persisted until the General Electric Company (with the aid of its own expert staff), acting on his orders and at the expense of Fessenden's employer, finally built the dynamo desired.

Perhaps the strongest point suggested by defendants on the file wrapper branch of the case is that which calls attention to the references of Fessenden to the use of the spark discharge. See reissue patent, line 39 et seq. After describing his system, Fessenden said:

"I am able to substitute for the induction coil a spark gap now in use, a dynamo or similar source of alternating voltage."

He then continued:

"If the dynamo be used without the spark gap, I am able at once to produce a continuous train of radiant waves; * * * furthermore, where the spark discharge is used, I am able * * * to completely bridge over the intervals of no radiation."

Apparently Fessenden supposed that he could work out continuous generation with the spark gap as well as with the dynamo without the spark gap; or, it may be, that this was in the nature of an anchor to windward in the characteristically Fessenden hope of covering everything which might thereafter be discovered or invented. But, because Fessenden advanced this theory as to spark discharge, it does not follow that the patent failed to disclose a system of continuous generation and the physical means therefor. It is enough that the specification disclosed the invention, even though in so doing extraneous or irrelevant or useless matter was also inserted in the specification.

In brief, the original specification was clear enough to instruct the art, and the amendments thereto, so far as affect this case, were mainly in the nature of elaboration and clarity. Boyce v. Stewart-Warner Speedometer Corporation, 220 Fed. 118, 136 C. C. A. 72. From the foregoing summary outline, it follows that there was no enlargement or departure in respect of claims 2, 3, 15, 16, and 17.

Claims 19, 20, and 21 are on a basis quite different from the other claims in issue. In claim 2, for instance, the sending conductor, when read with the definition in the specification, is clearly described, and the adjustment of capacity so as to accomplish low frequency was something readily understandable  In claim 19, however, such an expression as "being co-ordinated and relatively adjusted to generate and radiate a substantially continuous stream of electromagnetic waves" amounts practically to stating a result—contrary to the doctrine of Corning v. Burden, 15 How. 252, 14 L. Ed. 683. Further, the terms are very indefinite and not within the principle of Eibel Process Co. v. Remington-Martin Co., 234 Fed. 624, 148 C. C. A. 390. No reference is made to the "sending conductor" of the patent, but, inter alia, to "a" source of alternating electrical energy; i. e., to any source without describing the character of the source. Further, there is no restriction as to the frequency to be used. This group of claims (19, 20, 21) represents an effort to corral the art by the use of comprehensive indefinite terms, and the specification does not help out nor limit these claims to explicitly stated instrumentalities which shall make up the "system." That these claims are intended to be broad and all-gathering is illustrated by the fact that most of the other claims were for more or less specific instrumentalities, such as (to illustrate) claims 2 and 23. The effort, as set forth in claims 19, 20, and 21 to foreclose broadly against the future a continuous generation system, cannot be approved and these claims are held void.

Starting with the foregoing interpretation of the patent, attention must next be turned to the prior art. Many prior patents, publications, drawings, and apparatus were introduced in evidence, which are of no service and tend only to swell the record; but in a case of this character, which is unfolded gradually as it proceeds, the trial court is largely helpless, because, before the subject is grasped, error may be committed by excluding some apparently irrelevant or useless previous patent or publication, which, perhaps, later may appear to the trial or appellate court to be germane and important.[1]  I shall therefore refer only to so much of the prior art as seems to me worthy of discussion.

On May 29, 1901, the art needed many advances, one of the most important of which was increased power, which could be utilized at the receiver. The elements of the claims in issue are concededly old, and, while there is a wealth of scientific discussion of many subjects, both by the experts and in the pertinent literature of this record, the essential questions are (1) whether spark generation was in 1901 the accepted method; (2) whether Fessenden was the first to disclose clearly and definitely a departure therefrom—i. e., a system of continuous generation with the practical means for its production; and (3) whether such disclosure rose to the dignity of invention.

In approaching the subject, it is extremely important to think, if possible, as of 1901. In this case, that is a troublesome task, because of the extraordinary progress in this art since then, and the consequent

---

[1] This observation does not apply to Mr. Tesla's testimony, which took the form of a lecture, for the failure to limit which I hold myself responsible.

difficulty of discarding from consideration many items of after-acquired knowledge. It is also necessary in this case not to accord undue importance to isolated suggestions in scientific papers and discussions. Such suggestions are not infrequently controlling in a well-developed and well-understood art where skilled men can readily appreciate the disclosure. In the infancy of a new, and, at the time, little understood, art, however, the alleged prior art necessary to negative invention must be clear, and doubts as to its meaning and disclosures should ordinarily be resolved in favor of the inventor.

The Lodge patents, infra, are, in my opinion, the most important prior art, and they will be discussed last.

*Tesla.* While the world is indebted to this inventor for some highly valuable contributions, his work and his patents and publications have added nothing to the branch of the art here under consideration. Time alone will determine whether some of his theories are right, but patent causes cannot be decided on speculation. Tesla's two-path conduction method depends upon impressing enormous voltages mounting to the millions, upon a terminal extending so high above the earth's surface as to bring it into or close to an air stratum sufficiently rarified to become a good conductor. To attain the enormous pressures it was necessary to store the energy in a condenser and then set it free at once. Such a system is far removed from accomplishing continuous wave transmission. (See Hogan's discussion.) Tesla's one-path conduction method seems too late; but, in any event, as Hogan, plaintiffs' expert, said:

"The whole proposition is highly speculative. * * * It offers a complete series of contrasts as opposed to radio telegraphy, either in theory or in practice."

Finally, Tesla's work was purely experimental, and added nothing to the practical art; nor did Bissing's article in the Electrical World of January 21, 1899, p. 85, add anything. Indeed, Bissing's reference to the Edison patent, 465,971, indicates that he classed Tesla's disclosure with the Edison and similar systems, whose effects are attributable to electrostatic induction and not to electromagnetic radiation.

*German Braun Patent of July 7, 1900*   I accept Hogan's views as to this patent. They are concisely stated as follows:

"The first part of the specification classifies electrical oscillations into three groups, the first of which may be produced mechanically by machines, et cetera, and which necessarily have extremely limited numbers of periods. The second group is the one where the number of oscillations is determined by Leyden jars and induction coils, and has frequencies so very much higher that it is exceedingly difficult to reduce the number to such an extent that it will approach the number of oscillations producible by machines. The third group of frequencies has become well known through the studies of Hertz, and is determined by the discharge of the capacities of 'simple bodies,' such as the normal conductor of a Hertzian oscillator or a small rod. Braun states that so far in the development of spark telegraphy only discharges of simple bodies, such as the Hertz oscillator, have been used, and that 'in this telegraphy by means of the electromagnetic waves of Hertz it is an essential condition that receiver and transmitter should be visible to each other uninterruptedly and to their entire extent. The sails of a vessel, smoke, trees, buildings, et

cetera, weaken the effect when intercepting the vision, or interrupt the effect entirely.' He then proposes to get longer waves than those of Hertz—that is to say, waves longer than two or three meters in length (which are of the sort which would be affected by the interposition of objects which would prevent complete visibility of the receiving station from the transmitter)—and says that these increased wave lengths will be secured from the discharge of a Leyden jar. These wave lengths, somewhat longer than the exceedingly short disturbances of Hertz, are nevertheless much shorter than the wave lengths used by Marconi in 1901. The oscillator, as shown in the drawings and as operated for the production of wave lengths, say, of 20 or 30 meters, will have enormous periods of inactivity between each spark discharge of the Leyden jar or condenser. There is no suggestion of longer wave lengths than those used in the practice of the art of radiotelegraphy, but merely of wave lengths longer than those of Hertz's original experiments. There is no suggestion of continuity of generation, and in fact the exact opposite must result from the use of such an arrangement of apparatus; and there is no antenna shown or described, except that near the end of the specification a 'longitudinally stretched transmitter wire' is referred to."

*Marconi Four-Circuit Tuner Patent, Belgian 162,810.* For convenience, the experts have considered British patent 7,777 of 1900. See, also, United States patent 763,772, discussed in Marconi Wireless Tel Co v. National Electric Sig. Co. (D. C.) 213 Fed 815 Marconi, under this patent, used the spark gap. By his arrangement he succeeded in producing quite persistent wave trains, but only damped wave groups could be produced. There is no disclosure of low frequency, nor of continuous waves. The longest wave length in the early practice under this patent was about 300 meters, corresponding to a frequency of 1,000,000 per second.

*Lodge British Patent, No. 11,575 of 1897, and United States Patent No. 609,154, August 16, 1898.* I think Judge Veeder has correctly summarized the main features of the Lodge advance in the following language:

"The capacity of a vertical wire is not great, and the extent to which it may be increased by lengthening the wire or adding capacity areas is obviously limited. Lodge came forward with a new idea. Although he recognized the impossibility of having a circuit which should be at once a good radiator or absorber and a persistent oscillator, he proposed a compromise. He increased the persistence of vibration of his radiating circuit at the expense of its radiating qualities, and increased the accumulative power of his receiving circuit at the expense of its absorbing qualities. Effecting this compromise by means of the introduction of an induction coil in an open circuit, he obtained a train of waves of approximately equal amplitude and thus rendered effective syntony possible. But the syntony thus obtained was utilized for selectivity alone. It was attained at the expense of the radiating and absorbing qualities of the circuit; and Lodge still supposed that for distant signaling the single pulse or whip crack was best." Marconi Wireless Tel. Co. v. National Electric Sig. Co. (D. C.) 213 Fed. 815, 847.

Undoubtedly, the Lodge antenna was of much greater capacity than was then in vogue. Lodge reduced the frequency of the ordinary Marconi system and secured a more persistent wave train by the insertion of the loading coils. The Lodge patent was a marked step forward, but it cannot be construed into a disclosure of continuous generation.

Going beyond the patent, I inquired quite at length as to the result to be expected if the linear dimensions of the Lodge antenna were

increased to those of the tallest Marconi antenna in use in 1901, viz. 180 feet; the point being to ascertain whether the wave frequency would be so much reduced as to get a substantially continuous wave. I think it is a fair assumption that the skilled man of the time would have investigated the problem along these lines, and this branch of the case has presented the greatest difficulty on the question of invention. However, I have finally concluded that Hogan is right in his opinion that the engineer of that time would not have increased the linear dimensions of the antenna without correspondingly increasing the loading coil, with the result of an increase in resistance so great as to impair seriously the radiating power. In any event, it is certain that no one has produced continuous waves by any system which follows the teaching of Lodge or any other spark system.

As in previous cases in this art, I have not attempted to cover the whole field of discussion found in this extended record; but I think enough has been touched upon to make clear that, although the art was advancing with an appreciation of the advantages of decreased wave frequency, the desirability of increased capacity, and the necessity for increased persistence, yet spark generation was still the accepted method, from which Fessenden departed, and thus contributed another way and means of transmission. Certain it is that Fessenden's patent substantially has ultimately been utilized in actual and successful commercial practice, and it is fairly entitled to be characterized as invention. I conclude, therefore, that claims 2, 3 10, 15, 16, and 17, are clearly valid. The validity of claim 10 is not so clear; but, reading it with the specification, I have resolved the doubt as to this claim in favor of plaintiffs.

The question of infringement does not invite discussion. The specific differences between the Sayville transmitter of defendant company and the transmitter of the patent do not avoid infringement. While, for instance, the frequency changers at Sayville are undoubtedly ingenious devices, their use does not affect infringement. Indeed, infringement of claims 2, 3, 10, 15, 16, and 17 seems plain.

There is no evidence against the individual defendants, and I see no occasion to prolong the case as to them; but, as in the heterodyne case, this can be taken up on the settlement of the decree. The usual decree will pass, holding defendant company for infringement of claims 2, 3, 10, 15, 16, and 17, and holding claims 19, 20, and 21 void.

Plaintiffs may have half costs. Submit decree on five days' notice.