KINTNER et al. v. ATLANTIC COMMUNICATION CO. et al. (two cases).

MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. ATLANTIC COMMUNICATION CO., Inc.

(District Court, S. D. New York. October 14, 1921.)

Patents ⬉318(4)—Profits from infringement of different radio patents apportioned.

Profits from the use of infringing devices in the equipment of a radio station for sending and receiving apportioned between various patents.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suits by Samuel M. Kintner and Halsey M. Barrett, receivers of the National Electric Signaling Company, against the Atlantic Communication Company and others, and by the Marconi Wireless Telegraph Company against the Atlantic Communication Company, Incorporated. Profits from infringement apportioned.

See, also, 249 Fed. 73.

For brevity the parties will be referred to as Marconi, Nesco, and Atlantic.

Sheffield & Betts, of New York City (L. F. H. Betts, John W. Peters, and Abel E. Blackmar, Jr., all of New York City, of counsel), for Marconi Wireless Telegraph Co. of America.

Frederick W. Winter, of Pittsburgh, Pa., for National Electric Signaling Co.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis and Dean S. Edmonds, both of New York City, of counsel), for defendant.

MAYER, Circuit Judge. In the opinion of the court filed on March 4, 1921, it was pointed out that further testimony was desired in order to aid the court in the solution of the problem of apportioning profits derived from sending from and receiving radio messages from and at Sayville.

*Receiving Profits.*—The testimony called for was confined to a consideration of the respective and relative merits of the following: (1) Fleming patent, No. 803,684; (2) Fessenden patents, No. 1,050,441 and 1,050,728; (3) De Forest patents, Nos. 841,387 and 879,532; (4) Armstrong patent, No. 1,113,149; and (5) the characteristic of the audion to act as a generator of oscillations. Each litigant called one expert, viz. Mr. Waterman for Marconi, Mr. Hogan for Nesco, and Prof. Hazeltine for Atlantic.

The problem is, in some respects, peculiar to the radio art for the reason that there is probably not any sending nor receiving station whose practical and commercial efficiency is not dependent upon the use of various devices. To determine on a scale of 100 the percentage to which the respective devices are entitled is obviously not an easy task, and the result cannot represent an accurate computation based upon some definite method of calculation or apportionment.

It would, indeed, help the art on its commercial side, if radio experts and engineers, forgetting the requirements of a particular case, would consider whether a formula could be devised which though not controlling upon the courts would doubtless be helpful, and perhaps persuasive. The desirability of some such convention is illustrated by the case at bar where three experts, well known in the art, differ radically in some of their results. This difference is shown in the final figures for receiving profits as follows:

|  | Waterman. | Hogan. | Hazeltine. |
|---|---|---|---|
| Fleming | 33.43 | 11.25 | 13.50 |
| De Forest | 25.93 | 11.25 | 32.40 |
| Oscillation | 14.82 | 5.00 | 19.00 |
| Armstrong | 14.00 | 11.25 | 21.60 |
| Heterodyne | 11.78 | 61.25 | 13.50 |

The Sayville receiver was a composite structure, embodying in its construction and mode of operation features of invention so incorporated in the system that physical separation could not be effected. In most instances these features were utilized in improved forms and not as described in the patents. All of the experts agree that, in order to ascertain the percentage of profits to be attributed to each feature or invention, a number of factors should be taken into consideration. These are listed by Waterman as follows:

A. Advantageous characteristics possessed by the specific embodiments of the inventions originally disclosed.

B. Indispensability, in the apparatus used, of the essential idea taken from each of the patents to make up the final improved apparatus.

C. The inherent capacity for development of each invention as indicated by the history of development down to date (of the Sayville work).

D. Relative order of amplification, selectivity, and reliability contributed by each.

Under each of these headings, Waterman assigns certain percentages to the five features, then adds these, and giving equal weight to his A, B, C, and D, divides by four, and obtains as a result the percentages noted supra.

Hogan was of opinion that there were four primary features: (1) Reducing the harmful effects of static interference; (2) the control of the signal tone frequency;· (3) the intensity of the desired signal as heard in the telephone; (4) the convenience of operation of·the entire assembly. To each of his 4, Hogan assigns a percentage of 25. He then gives each feature something or nothing under each head, and the total is the result of what might be called separate addition. Thus he allotted to the Fessenden heterodyne 25 per cent. under (1); 25 per cent. under (2); 6¼ per cent. under (3); and 5 per cent. under (4).

Hazeltine worked out the formula or method shown in his chart 2, hereto annexed. His scheme consists in arranging the inventions in chronological order and estimating the advance in the art consequent on each invention. This advance in the art is then apportioned between that invention per se and prior inventions on which it may depend. After obtaining these divisions he adds the amounts credited to each invention to give the total.

Hazeltine, however, complicated his method by adding two inventions to the five features; i. e., the two transmitter frequency of Fessenden and the rectifier heterodyne. He regarded this inclusion as necessary for purposes of calculation "on account of the close interdependence of the various inventions"; but he excluded these two added inventions from his figures, so that the sum of the.allotments would add up to 100.

This was an unnecessary complication which detracts from an otherwise highly constructive idea. Hazeltine's contribution to the discussion has been the new thought that a method or formula should be worked out, which, so far as practicable, shall automatically assign percentages or values to the respective features.

When, however, all is said, it is plain that the percentage assigned to the factors on any of the theories advanced rests to a considerable extent upon the judgment of the decider of the facts; and this is exemplified by the experts in this case where there is such a wide divergence of opinion not so much as to what factors should be considered, but as to what should be the value of the different factors. The point is that, in the last analysis, the percentages arrived at can reflect only matters of opinion rather than conclusions based on an accurate scientific standard.

Fortunately all of the features concerned are familiar to this court. All of the inventions have been discussed by the District Court and some by the Circuit Court of Appeals. Marconi v. De Forest (D. C.) 236 Fed. 942, affirmed 243 Fed. 560, 156 C. C. A. 258; Marconi v. De Forest (D. C.) 261 Fed. 393; Kintner v. Atlantic (D. C.) 241 Fed. 956; Kintner v. Atlantic (D. C.) 249 Fed. 73.

An examination of the cases supra will show that each of the five features, here under consideration, constituted a valuable contribution to the art; but in studying the problem of apportionment certain practical considerations come into play. An invention cannot be regarded academically from the standpoint of a scientific achievement. It must be estimated, among other things, from the viewpoint of its contribution to the practical operation of the device which produced the dollars. The parties to the litigation are not engaged in an altruistic effort to select niches in the radio Hall of Fame, but in a business contest to obtain what they claim is their just share of money profits. What, then, induced Atlantic to use the five features?

Obviously, from Atlantic's standpoint, these features were (1) indispensable, and (2) the most efficient in practical operation to receive messages reliably and expeditiously and thus to do business at a profit. These factors of indispensability and efficiency in receiving, however, are to some extent interdependent. If a feature was indispensable, it was such because its efficiency contributed to the successful operation which produced the profits. Indispensability may be used in one of two senses; i. e. (a) where a receiving system would not work at all without the invention or device under consideration, or (b) where the particular system (in this instance the receiving station at Sayville) utilized the best inventions or devices to receive signals and had it not done so, then a substitute arrangement would have given inferior results. It might be said, for instance, that under the definition (a), supra, the Armstrong feed back circuit was not indispensable because, without it, signals might nevertheless be received, but such a conclusion would be academic and unjust for the reason that the use of this invention assured the readability of many signals which otherwise would have been lost. So also, from another point of view, tikkers and rotary condensers might have been substituted for the heterodyne, but there can be no doubt that the heterodyne was the more effective and produced results which could not have been attained by tikkers and rotary condensers. In considering, however, the relative importance of the five features, it is important to bear in mind the part played by the in-

vention itself and that played by improvements on or developments of the invention which discard the specific means for carrying it out.

Thus, in the case of the Fleming patent, the advances made by De Forest and Armstrong did not require that anything disclosed by Fleming should be discarded but, on the contrary, De Forest and Armstrong built on the Fleming foundation. In the case of the Fessenden patents, however, although the inventive thought was highly meritorious, it was necessary to discard the arrangements disclosed, before commercial progress could be made. As testified by Waterman, the heterodyne "was an idea set forth correctly, but not accompanied by any disclosure of practicable means for carrying it out. The inventions which have been required to make it a useful device did not grow out of it and were not prompted or suggested by it, except the substitution of a detector and ordinary 'phones for the indicators which Fessenden used."

It is not practicable to set forth in further detail the discussion by the experts of the different points under consideration, but those interested in the art will find all the testimony well worth reading. Briefly stated, after taking into consideration the various opinions expressed by the experts, it is plain that the two outstanding factors are Waterman's B and D, assuming that, under D, Hogan's 4 (i. e., convenience of operation) is to be included. Waterman's A and C are to be considered as explanatory of the inventions or devices and to that extent as helping to ascertain the indispensability value and, in some respects, the value to be assigned under B.

Under the head of indispensability, it is plain that the Fleming valve was at the basis of the De Forest, Armstrong, and oscillation features. This group was developed independently of the heterodyne and, from the standpoint of indispensability value, is entitled to a much greater percentage for many reasons advanced by Waterman and Hazeltine. Under this head the percentage assigned are as follows:

Fleming ............................................. 35
De Forest .......................................... 20
Oscillation ........................................ 10
Armstrong .......................................... 20
Heterodyne ......................................... 15

Under the heading of relative order of amplification, selectivity, reliability and convenience of operation, the percentages assigned are as follows:

Fleming ............................................ 25
De Forest .......................................... 25
Oscillation ........................................ 15
Armstrong .......................................... 15
Heterodyne ......................................... 20

Adding the two sets of values and dividing by 2, the result is:

Fleming ............................................ 30.00
De Forest .......................................... 22.50
Oscillation ........................................ 12.50
Armstrong .......................................... 17.50
Heterodyne ......................................... 17.50

The total profits are $253,467.78, ascertained as follows: $246,467.-53, as found by the master, plus (deducting the De Forest and Armstrong royalties) $7,000,25. The depreciation item of $3,768.91 will stand as the master found.

Finally (in order to avoid misunderstanding in any cases which may hereafter arise), it is to be understood that the percentages, supra, represent the conclusions in respect of these particular litigations. They are not to be construed as indicating the relative positions of the five features considered academically as scientific achievements.

*Sending Profits.*—The Fessenden invention was so fully discussed in Kintner v. Atlantic (D. C.) 249 Fed. 73, that it is necessary here only to state that, in the broadest sense of the term, it is indispensable to the successful commercial sending operation at Sayville. The fact that Fessenden pointed out the means for generating an alternating current of radio frequency debars the Arco and Meissner patents from sharing in the factor of indispensability. These patents were not, in any sense, an improvement over Fessenden. They contained merely instructions for a specific way of generating continuing waves of the necessary frequency; i. e., by means of a low frequency alternator plus frequency doublers. On the other hand, the Arco and Meissner patents, as exemplified in the mechanism actually used at Sayville, contributed to the efficiency of the sending operation. If, however, there was available in the art some substitute for the Arco and Meissner booster arrangement which was equal in practical value to that booster, then there should not be any percentage assigned to the frequency booster under the head of efficiency.

In the period subsequent to the date of the Fessenden patent, Fessenden and his associates endeavored to develop a suitable high-frequency large capacity alternator; but I think that the evidence shows that the high-frequency alternator was not, at the beginning of the accounting period, a device available to the engineers from the standpoint of a then immediate installation; and in respect of the Le Blanc alternator and the Goldsmith alternator it may be said that at that time there was too much doubt as to their efficiency for the purposes of Sayville to justify characterizing these devices as a true alternative of Arco and Meissner.

It may very well be that, with the disclosures of the Fessenden patent in mind, engineers could have developed, as Fessenden and Alexanderson did, and, as may also have been accomplished with the Le Blanc and Goldsmith alternators, a mechanism or device which would prove to be, in every sense, an alternative of Arco and Meissner. But Atlantic was confronted with an immediate requirement which Arco and Meissner filled. It would therefore be unjust to exclude Arco and Meissner from the factor of efficiency considered in the commercial sense. It seems, therefore, fair to accord to the frequency boosters patents 20 per cent. under this heading. Thus, the total for Fessenden will be 180, and for Arco and Meissner 20, and dividing these figures by 2 the result is that Nesco is entitled to 90 per cent. of the sending profits, and Atlantic is entitled to retain 10 per cent. thereof. The

sending profits apparently were $210,489.91; but, if this figure be not correct, the proper figure may be called to the attention of the court upon the settlement of the decree.

Settle decree in accordance with this opinion on five days' notice.

CHART 2

### RECAPITULATION

REGENERNATIVE OSCILLATING AUDION HETERODYNE 14 ......... 19.0
REGENERATION ......... 16 ......... 21.6
AUDION ......... 24 ......... 32.4
FLEMING VALVE ......... 10 ......... 13.5
LOCAL HETERODYNE ......... 10 ......... 13.5
74      100.0

TWO TRANSMITTED FREQENCIES   12
RECTIFIER HETERODYNE   14    26
100