KINTNER et al. v. ATLANTIC COMMUNICATION CO. et al.

(District Court, S. D. New York. April 2, 1917.)

PATENTS &⪯328—VALIDITY AND INFRINGEMENT—WIRELESS SIGNALING.

    The Fessenden patents, No. 1,050,728, for a method of signaling, and No. 1,050,441, for electric signaling apparatus, cover in the radio art the production of signals by beats whose frequency is the difference between that of the incoming signals and that of locally produced oscillations, which was previously unknown in the art, except as partially and broadly disclosed in a prior patent to the same inventor, over which the later patents, intended to perfect the system, disclosed patentable novelty and invention of a high order; also held infringed.

In Equity. Suit by Samuel M. Kintner and Halsey M. Barrett, receivers of the National Electric Signaling Company, against the Atlantic Communication Company, August Merchens, P. C. Schnitzer, and

K. C. Frank. On final hearing. Decree for complainants against defendant corporation.

Suit for infringement of claims 1 and 2 of letters patent No. 1,050,728, applied for by Reginald A. Fessenden, original on July 27, 1905, divisional on August 21, 1905, and granted January 14, 1913, for "method of signaling," and of claims 1, 2, 3, 4, 6, 9, 22, 23, 24, 25, 26, and 29 of letters patent No. 1,050,441, applied for by Fessenden July 27, 1905, and granted January 14, 1913, for "electric signaling apparatus."

Frederick W. Winter, of Pittsburgh, Pa., and Drury W. Cooper, of New York City, for plaintiffs.

Charles Neave, of New York City, and Hervey S. Knight, of Washington, D. C., for defendants.

MAYER, District Judge. These patents may be discussed together, having been applied for in one application, which, by the requirement of the Patent Office, was divided into an apparatus and a method patent. They are concerned with the system of radio signaling known as the beats system, or more especially the "heterodyne"—a name created by Fessenden, which has survived in the art. While the record contains numerous symbolic equations and diagrams, in which experts in this art think and love to revel, the case is within a narrow compass from the viewpoint of the patent law. This, because there is a paucity of prior art, an agreement on many important propositions by able experts, and a state of facts where, once the character of invention is determined, the question of infringement presents little difficulty. The beats system in acoustics was old and well known, but Fessenden was concededly the first to apply this principle to signaling in the radio art.

From the beginning, the workers in this art, in their efforts to solve its many problems, devoted much attention and effort to the improvement of detecting means and apparatus. This history, sequentially and clearly set forth in Hogan's testimony, need not be here repeated, for the subject, as affecting various devices, has already been referred to in opinions of the courts. United Wireless Telegraph Co. v. National Electric Signaling Co., 198 Fed. 386, 117 C. C. A. 261; National Electric Signaling Co. v. Telefunken Wireless Tel. Co. of U. S. (D. C.) 209 Fed. 856, affirmed 221 Fed. 629, 137 C. C. A. 353; Marconi Wireless Telegraph Co. v. De Forest Radio Telephone & Telegraph Co. (D. C.) 236 Fed. 942.

Naturally, in the early days of the art, many abstruse problems were not as yet solved, and there was no reason to believe, without independent research and experiment, that a principle applicable to sound could be availed of in radio. When, therefore, Fessenden, by his patent No. 706,740, applied for September 28, 1901, and granted August 12, 1902, announced:

"Broadly my invention consists in the production of electric beats analogous to sound beats and their utilization in receiving conductors * * *"

—he made, in the best sense, a new contribution to the knowledge of the time; for nowhere and by no one had there been even a suggestion of the applicability of the "beats" principle to radio.

For reasons which will presently appear, the system disclosed by this first patent of Fessenden presented certain practical objections; but no one from August 12, 1902, until July 27, 1905 (the application date of the patents in suit), added a shred of information as to how to overcome these objections, or to improve on the basic principle of No. 706,-740—evidence in itself of inventive genius in an art which has moved so rapidly that the impossibility of yesterday has become the commonplace of to-day.

The principle utilized in No. 706,740 was the production of beats by oscillations of slightly different frequencies, so that the signal tone was that of the difference between the two beat frequencies. Both frequencies were generated at the transmitting station, and thus such a system required a double installation, and, as both signals would arrive with the same loss, amplification of the received signal was not attained by the use of the second frequency. Further, such a system did not afford the receiving operator any means for controlling the tone of the received signal.

These commercial and operating objections were overcome by the patents in suit, which gave practical embodiment to the idea of the local production of oscillations. This purpose is expressed by Fessenden in the method patent, No. 1,050,728, as follows:

"The primary object of my invention is to eliminate interference and increase the intensity of signals, by operating the indicator at the receiving station by the conjoint energy of the received electric impulses, and certain co-operating currents produced locally at the receiving station. This application furthermore contemplates the production of signals by *means of harmonic beats produced between the currents of the received electric pulses and the locally produced co-operating electric pulses, the indicator being moved by the energy of the combined currents and therefore being under control, as to the frequency of motion, by the receiving operator.*"

Claims 2 of each patent typify the broad claims urged, while other claims of the apparatus patent, such as claim 1, are more definite and limited in scope. These claims 2 are as follows:

"2. In the art of signaling, the method which consists in making an indication by the interaction of received impulses of sustained frequency and amplitude with impulses of neighboring frequency generated by a constantly acting local source of energy at the receiving station."

Apparatus patent, claim 2:

"2. A signaling system having in combination at a receiving station, a receiver and a constantly operating frequency determining element of a high frequency slightly different from that of the received oscillations."

So far as language goes, the specification and claims in issue are phrased in broad terms, giving a wide range of equivalents, and contemplating a "variety of forms of receiving devices," and not confining the sending method, although preferring "to use for sending a means for producing continuous generation, which may be, for example, a high frequency alternating generator. * * *"

In brief, the patents set forth a clear description of the production of signals by beats whose frequency is the difference between that of the incoming signals and that of the locally produced oscillations.

Outside of Fessenden's No. 706,740, it is necessary to refer only to Thompson's British patent, No. 525, of 1898, and Shoemaker's United States patent, No. 711,184, of October 14, 1902.

The Thompson patent undoubtedly does not relate to radio transmission, but to induction telegraphy, although using the expression "wireless telegraphy." Marconi Wireless Telegraph Co. v. National Electric Signaling Co. (D. C.) 213 Fed. 815. The disclosure is merely that of a locally generated current, which acts as one of the components for actuating the particular form of indicator disclosed, and possibly also as an exciter for the receiver. Thompson, for his purpose, insisted on "alternating currents of equal frequency with those employed in the transmitted signals"—a theory utterly different from and inconsistent with a "beats" system.

Shoemaker is disposed of by Hogan's summarized statement as follows:

"There is no disclosure of beats production. Beats production could not be utilized, if it were secured. There is no disclosure of the desirability of persistence, since highly damped waves are stated as being preferred. There is no provision for coincidence of phase of the wave trains which is highly essential for the operation of the dynamometer. There is no provision for coincidence of the wave trains themselves. Therefore the patent is in no sense a disclosure which includes the heterodyne principle, as we have been discussing it."

These two patents and other prior art (except No. 706,740) failed to teach the art anything in respect of the use of beats, and, at most, merely disclosed a local source for operating some particular form of receiver. They made no impression on the art, and are useful only as an argument in a lawsuit, after they have been extracted from the recesses of forgotten Patent Office files.

A painstaking analysis by defendant of the file wrapper was undertaken, in the expectation of showing that the patents are to be confined to a particular method, based on the underlying principle of interaction of separately produced fields of force, or, in other words, the employment solely of mechanically operated receivers, involving the use of a field of force developed from a local source, interacting with a field of force developed by the receiving current.

But neither the language used nor the spirit of the invention crowd it into such narrow limits. What changes were made in the progress of the application through the Patent Office were purely of a phraseological and clarifying character, and the file wrapper is in refreshing contrast to some others of the same inventor which have been subjected to the scrutiny of the courts; for in this instance Fessenden went into the Patent Office with a clear and consistent disclosure, and came out successfully, in all substantial respects, with what he went in.

On the question of invention, therefore, the sole inquiry is whether the patents in suit disclose patentable novelty over No. 706,740, and the answer is that there can be no doubt that what Fessenden accomplished involved invention of a high order. To hold that some accomplishment is invention necessarily partakes somewhat of an ipse dixit; but, in this case, the conclusion is readily arrived at, if one will but look at this art with the vision of 1905. With that approach,

no one can say that an appreciation of the greater control and simplicity of operation under the patents in suit over No. 706,740 was obvious. When, also, it abundantly appears that improvements such as were later devised by Lee & Hogan, and such as still later involved the use of the audion, were built upon the vital foundation of Fessenden's patents, there can be no doubt of the fact and the merit of his invention.

But it is said (1) that the detector indicator of Fessenden fails to show utility; and (2) that the local source illustrated by Fessenden in his patents is of little or no value in practical and commercial work.

*The Detector Indicator.* Of course, the dynamometer and static telephones, in view of the progress of the art, are now superseded; but the evidence fully establishes that they were operative in the patent sense, and the static did very well when we consider the small distances traversed in the early days of the art. To say that because a better detector is now used in a system which comprehends the essentials of Fessenden's heterodyne is but another way of arguing that a later improvement annihilates a previous invention. General Electric Co. v. Laco-Philips Co., 233 Fed. 96, 147 C. C. A. 166.

*The Local Source.* The objection to the high frequency alternator is that it is impracticable, because its speed is not sufficiently constant, and it is not flexible, in that its speed cannot be changed quickly enough to secure the variability of the note necessary for heterodyne reception. This criticism is well founded as to ship service, because of the effect of the rolling of a vessel; but as between land stations, such as Sayville and Nauen, the criticism is only one of degree. A small electric motor driven type of alternator is comparatively efficient for such land service, and, while not perfect, would doubtless have had considerable use, but for the appearance of the oscillating audion.

Plaintiff, however, was fully alive to the necessity of devising the best possible local source, and spent a great deal of time and money in the effort to develop an arc which would meet the requirements of ship service. Such an arc was developed by Cohen and Van Dyck, two experts in the employ of plaintiff, and, while there are temperamental lapses in the contemporaneous correspondence and reports of Cohen, on the whole that correspondence shows that from his *then* point of view he thought that he had accomplished useful results. The fact that Cohen now, because of advances in the art, has changed his view, does not obliterate what he then wrote.

Elaborate tests were made by the United States government between its station at Arlington and the U. S. S. Salem on its way to Gibraltar. Clark, for the Navy, in his reports, has borne witness to the efficiency as of that time of the Cohen-Van Dyck arc (slightly modified), and, indeed, when reporting interference tests off Hampton Roads, he wrote:

"The heterodyne operated throughout the whole test without the least necessity for adjustment. The arc was not touched between 1 p. m. and 4 p. m., operating continuously between these times."

In fact, the government bought three sets of plaintiff, one for Arlington, one for the U. S. S. Salem, and the third for the U. S. S.

Birmingham, and the British naval authorities were so impressed with what they learned at Gibraltar that the British admiralty also bought a set. That Clark's views are now somewhat modified is not strange. He is a man of integrity and ability, but naturally, and of necessity, he is now testing mentally all apparatus by the standard of perfection of the Navy and its requirements—a standard at the moment intensified by events undreamed of when the Arlington-Salem tests were in progress.

Nor is much emphasis to be given to the impatient utterances of Kintner in his correspondence with Cohen; for Kintner as manager, and later as receiver, of the National Electric Signaling Company, was merely prodding his engineer and expressing the anxiety of a business head who desires to see experiments transmuted into lawful money of the United States.

But it is said that little value can be attached to the Arlington-Salem tests, because the Lee & Hogan system, and not the Fessenden invention, was used, and reference is had to the Lee & Hogan file wrapper and the arguments of their attorney, Mr. Winter. Of course, Lee & Hogan and their attorney were advancing their best arguments to the Patent Office; but it would be a strange doctrine if the contentions of later inventors were to be accepted as decisive of the character of the previous invention. Whether the Lee & Hogan improvement was invention is not here in issue, but this much is certain: That Lee & Hogan, who were employed by the National Company and had worked under Fessenden's supervision, recognized that their invention had its genesis in the Fessenden system. They say in their specification (No. 1,141,717, applied for November 16, 1912, and granted June 1, 1915):

"We understand the essence of the well-known Fessenden heterodyne receiver. * * * Our invention in a general way *embodies the same idea*, but comprises a method for making a receiver more sensitive and controllably selective than those heretofore known."

The main agreements and differences between the Fessenden patents and that of Lee & Hogan are summarized in a statement agreed upon by Professor Zenneck and Mr. Hogan, attached hereto for convenience as Appendix A; and, in that connection, I desire to express to each of these experts my appreciation of the frankness with which, throughout, they have dealt with the court, and of the assistance they have thereby given.

In now approaching the question of infringement, the breadth of the invention is to be measured to some extent by its advantages. Of these, many are recited by Hogan—some quite individualistic; others, perhaps, possessed by other systems. It will suffice to refer to those apparently agreed upon by both Zenneck and Hogan, all of which are of major importance:

First. The control of the pitch of the musical signal at the receiver.

Second. The increase of the sensitiveness of the receiver to the desired signal.

Third. Station selectivity, or the ability to read signals at a given station without interference from other stations.

241 F.—61

First. This advantage cannot be minimized. The human ear is not a standard institution, and operators have their favorite note to which they are best sensitive. To catch the signal of a vessel in distress, to receive accurately a commercial message, or to understand exactly the order given in a naval engagement, are in these days requirements of prime importance. No more striking instance of the difference in human ears can be given than that which occurred at the Bush Terminal demonstrations. The ear of so accomplished an expert as Professor Zenneck was insensitive to a signal clearly heard and distinguished by the lay court, thus showing the great value of controlling the pitch or tone of the signal.

Second. This advantage is self-explanatory.

Third. This advantage is best illustrated by the following question to Professor Zenneck and his answer:

"Q. To what extent is selectivity sought in commercial practice? A. Selectivity is very important in practical work, taking the general meaning of selectivity as producing an effect from one station which is desired, and cutting out the effects from other stations."

With these major advantages, and other advantages minor in character, the heterodyne system, on this record, is concededly the best, where the transmission is continuous, or, as some call it, by sustained waves—as between Sayville and Nauen.

In determining whether defendant infringes, it is necessary to refer only to the defendant's use of the oscillating audion, for in all other respects the controversy as to infringement is not substantial. The oscillating audion is an extraordinary instrumentality. By what was apparently an accidental appreciation, it was discovered that the audion, in addition to its detector quality, was an oscillation producer. This Hogan discovered, although he does not know whether he was the first so to do. Fessenden, in his patent No. 1,050,441 (page 1, line 74 et seq.), had wisely indicated that the future might develop means other than were then known for producing local oscillations; for he said:

"Any other suitable source for producing unintermittent oscillations may be used."

When, therefore, this unexpected characteristic of the audion became known, it was at once obvious to any man skilled in the art that this "self-heterodyne" could be utilized, and, because of its simplicity and efficiency, that it would at once supplant existing devices; and infringement is no more avoided thereby than it would be if some one should invent an alternator whose speed could be changed instantaneously.

It is argued, however, that in the use of the audion in combination there is a superposition of currents, or, in other words, the two currents produced by the two frequencies are combined in a single circuit, and this combined circuit is converted into a pulsating current, which moves the telephone diaphragm. This is Austin's theory, supported by Armstrong and Zenneck. It may be right or wrong. If right, it makes no difference; for the fundamentally accepted fact is that "beats" are produced, and there is a local source of oscillations,

and, in view of the merit of Fessenden's invention here in issue, a different scientific action is immaterial. To quote Zenneck in part (see XQ. 78 et seq. and XQ. 79 et seq.):

"XQ. 78. In the receiving circuits used at Sayville, there is an interaction between the incoming current and the locally generated oscillations producing electrical beats, is there not? A. There is the superposition of two currents of different frequency, one produced by the incoming waves and one produced by the oscillating audion.

"XQ. 79. And the superposition of those two currents produces what we call beats, does it not? A. Yes."

For the reasons thus outlined, the patents are valid and infringed.

It is not without satisfaction that I arrive at this conclusion. Walker and Given, the financiers of National Electric Signaling Company, are little known; but they well deserve some reward for their courageous investment of substantial sums of money in establishing experimental stations, particularly at Brant Rock, Mass., and Machrihanish, Scotland, in the days when this art was in its infancy, and some impeded its progress by stock exploitation. These men conducted the work of their company along legitimate lines, and, apparently, gave Fessenden and others carte blanche in the desire to advance the art and advance its commercial usefulness.

The Federal Reporter records the inscription on more than one tombstone erected to the memory of a Fessenden patent; but, if I am right, Fessenden and his financial backers may have the comfort of knowing that the "heterodyne" is a contribution which will long be appreciated in this remarkable art, which has added so much to the welfare of mankind.

The customary decree, with costs, may be settled on two days' notice against defendant Atlantic Communication Company. I see nothing in the evidence to charge the individual defendants with liability. Whether further testimony in this regard shall be taken can be discussed on the settlement of the decree.

## Appendix A.

A. The "dynamometer" heterodyne receiver of the Fessenden patents in suit and the "detector heterodyne" receiver of the Lee & Hogan patent are alike, in that the following features are included in both:

(1) An antenna, in which the received waves set up electrical oscillations of their own radio frequency.

(2) A local source of radio frequency electrical oscillations, which, while receiving, operates all the time and at a frequency slightly different from the incoming wave frequency.

(3) A telephone diaphragm, which (in receiving undamped waves with locally generated undamped radio frequency currents) vibrates to produce signals at a musical tone of the beat frequency, which is defined by the difference of the two radio frequencies, and which vibration is controlled by the combination of the received and locally generated radio frequency energies producing beats.

(4) By the combination of the incoming and locally generated radio frequency energies to produce beats there is effected a telephone response greater than that obtainable, upon an indicator of the same sensitiveness, by the action of the incoming waves alone.

(5) The increase in telephone response described in paragraph 4 is a maximum when beats are produced between undamped incoming and undamped

locally generated radio frequency energies, and this increase in response becomes less as the damping of either radio frequency component is increased.

(6) A number of other similarities of minor importance exist.

B. The main differences between the Fessenden patents in suit and that to Lee & Hogan are as follows:

**Fessenden.**

The mechanical movement in the indicator which makes the signal perceptible is directly produced by the interaction of two magnetic fields of radio frequency.

The operation of the dynamometer telephone disclosed in the patents in suit does not depend upon a combination of the two radio frequency currents in one circuit.

In the dynamometer telephone receiver no audio frequency current is produced.

The response of the dynamometer telephone is determined by the product of the two currents.

**Lee & Hogan.**

The telephone used as an indicator is operated by an audio frequency pulsating current.

The two radio frequency currents are combined in one circuit, and their resultant current or voltage acts upon a detector.

The resultant of the two radio frequency currents combined in one circuit acts upon a detector, and is converted thereby into an audio frequency pulsating current acting upon the telephone.

The amplitude of the radio frequency beats acting upon the detector depends upon the sum of the two radio frequency currents; and the amplitude of the audio frequency pulsating current, acting upon the telephone indicator (and therefore the response of the telephone), depends upon the current-voltage characteristic of the detector.