**KINTNER et al. v. ATLANTIC COMMUNICATION CO et al. (two cases).**

**MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. ATLANTIC COMMUNICATION CO., Inc.**

District Court, S. D. New York.
March 4, 1921.

Sheffield & Betts, of New York City (L. F. H. Betts, John W. Peters, and Abel E. Blackmar, Jr., all of New York City, of counsel), for plaintiff Marconi Co.

Frederick W. Winter, of Pittsburg, Pa., and Drury W. Cooper, of New York City, for plaintiffs Kintner and Barrett.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, of New York City, of counsel), for defendant Atlantic Communication Co.

MAYER, District Judge.

The questions involved are highly interesting, and, in some respects, novel. The report is from a special master of experience and distinction whose opinions command great respect; and, both for that reason and because of the nature of the case, the reasons for disagreement will be somewhat fully set forth.

Atlantic, an American corporation, owned and operated a radio station at Sayville, Long Island. From August 1, 1914, to April 7, 1917, this station carried on wireless telegraph communication with the station at Nauen, Germany, owned by a German corporation known as Telefunken. The gross tolls paid for messages moving to and from these two stations with each other during the period supra was $1,597,057.84. In the operation of the Sayville station certain devices were necessarily used for sending messages from Sayville to Nauen and for receiving messages at Sayville from Nauen. It is in respect of certain of these devices found to have infringed claims of certain patents that this accounting was decreed.

The two Nesco cases involved (1) the patents relating to the system of heterodyne sig-

nal reception referred to in Kintner v. Atlantic Communication Co. (D. C.) 241 F. 956 and (2) the reissue patent involving the "sending conductor" and continuous wave system referred to in Id. (D. C.) 249 F. 73.

The Marconi suit involved the so-called Fleming valve patent. In this case, an interlocutory decree was entered on consent, evidently because of the adjudication referred to in Marconi v. De Forest (D. C.) 236 F. 942, affirmed (C. C. A.) 243 F. 560.

Subsequently, this court held that the use of the "audion" as an amplifier infringed the Fleming patent. After a trial on supplemental bill and answer this court also held (261 F. 393) that the use of the audion as a generator of high frequency oscillations was also an infringement.

It will thus be noted that the Marconi patent and the two Nesco heterodyne patents have to do with receiving signals, and the Nesco continuous wave patent has to do with sending signals.

The special master has prepared two sets of figures, based on two different theories. On one theory, the tolls are evenly divided between Atlantic and Telefunken; on the other, the tolls are apportioned in accordance with what is called in the case the "traffic agreement" between Atlantic and Telefunken. As pointed out by the master:

"When messages are transmitted electrically between distant points, A and B for instance, the line of communication has two ends and each end is as important as the other; both must cooperate or there is no business done. No one would pay money to have his message shot into the air either at A or B, unless he knew that at B or A such message would be caught, recorded, transcribed and put in process of delivery to the addressee. Since each end is thus essential it would seem reasonable, if this were all, that all money received from senders for the transmission of messages going either way should be distributed equally between A and B. * * *

"Upon the oral argument no stress was laid upon the alleged existence of any international custom and we may start with the proposition that, since sending and receiving stations are essential correlatives of each other, it may fairly be assumed that tolls are earned equally by both, when the situation is normal."

Throughout the case it must always be remembered that we are dealing with the sending of messages which have a commercial value, in that they get through, and that the radiogram of a sender reaches the addressee. In the absence of an agreement, a fair disposition would be an equal division, quite irrespective of the investment in each station. If Nauen were worth many times the investment of Sayville or vice versa, either station by itself sending messages in the air with no station to receive them would have no commercial value.

It is the sending and receiving combined which create the business and hence the value. If one station cost $100,000 and the other $500,000, each would be indispensable to the other in equal respect, and, as above stated, in the absence of an agreement to the contrary, and also in the absence of proof of any international custom, there is no theory upon which the gross receipts can be disposed of other than by equal division.

Upon an equal division one-half the sending tolls (as found by the master) from Sayville to Nauen was $366,705.16. The expenses and charges were $156,215.35. The net or profit was $210,489.81.

Upon the same theory, one-half the receiving tolls (as found by the master) was $409,235.14. The expenses and charges were $162,773.61. The net or profit was $246,461.53.[1]

If, however, the calculations are made in accordance with the traffic agreement, the "sending" account would show a loss of $17,568.35; and the "receiving" account would show a net profit of only $31,617.37.

The expenses and charges are the same whether the calculations are made disregarding or applying the traffic agreement. The difference in the figures as to net profit is due to the fact that, under the traffic agreement, Atlantic was entitled to a much less share in the tolls than would be represented by an equal division.

The traffic agreement is described and the conclusions in respect thereof and the reasons therefor are fully set forth by the master in his report.

There were two agreements dated respectively August 2, 1914, and May 31, 1916. Paragraph 7 of the agreement, dated August 2, 1914 provided:

"Telefunken undertakes the guarantee that Atlacom shall have an annual revenue

---

[1] There is an item of $3,768.91 allowed for depreciation to which Marconi objects. If disallowed, the total profits would be $250,230.44.

out of the telegraph traffic of $100,000. Besides this guaranteed sum Atlacom has a claim to 25% of the telegraph tolls due to Sayville according to rates in effect at any and all times, as far as those tolls do not exceed $48,000. Above $48,000, Atlacom's share is reduced to 12½%.

"The accounting is done in the manner that Sayville submits monthly to Telefunken a special statement of all telegrams received from Nauen; Telefunken reports the telegrams received from Sayville at Nauen. According to the resulting number of words the telegraph tolls due to Sayville will be calculated."

On August 1, 1914, Germany declared war against Russia and in a few days the World War was on. Up to this time, there had not been transatlantic communication between Sayville and Nauen. Atlantic had built the Sayville station in 1913, and during 1913 and the first half of 1914 it carried on communication with Cuba and with ships under what was known as the spark system of operation. For the use of this system, Atlantic was licensed by Telefunken, such license being restricted to Cuba and shore-to-ship service. The operation had been at a loss. It is plain, however, that wireless communication was a matter of great importance to Germany.

The cables had been cut, and there were no means of direct communication between Germany and the United States unless through the instrumentality of wireless. In 1914, Dr. Karl G. Frank was the secretary and a director of Atlantic. He was also the representative of Telefunken. The stock which he held did not belong to him, but was held by him as agent of Telefunken. He was in Berlin in July, August, and September, 1914, and discussed with the representatives of Telefunken the business relations between that company and Atlantic.

At that time Telefunken either owned all or nearly all of the stock of Atlantic. Frank, when asked what proportion of the stock of Atlantic was owned or held on behalf of Telefunken in 1914, was unable to answer the question accurately, although he believed at that time that some stock of Atlantic was held by Ostheimer. Frank also thought that, perhaps, Stollwerck, the chocolate manufacturer, had some stock.

However, it is quite apparent from the testimony that, if Ostheimer and Stollwerck held any stock, their holdings were considered as negligible, and it is also apparent that Ostheimer and Stollwerck were not regarded by Telefunken as factors of any consequence.

In 1914, Frank, however, was the representative of Telefunken and the active manager of Atlantic. Atlantic was merely an American incorporation of the Telefunken investment and the Telefunken interest.

The reasons for and the motive of the discussions in Berlin between Frank and the Berlin Telefunken representatives are plain. It was a matter of vital concern to the German interests to establish wireless communication between Nauen and Sayville. Whether that could be done reliably and successfully was, at that time, a question. The Telefunken interests realized that they could not foresee the course which future events might take. Frank, however, lived here, and, if any difficulties arose, he was the one who would be called upon to bear the brunt of any unpleasant developments. The result was, to use his own language, that he "wanted, of course, to be safeguarded, to some extent, at least by an assurance from Telefunken that we had at least money enough to pay our bills and recognizing that, Telefunken made this agreement with" Atlantic, i. e., the provision for the payment of $100,000 to Atlantic quoted, supra.

This sum was regarded as sufficient to cover the operating expenses of Atlantic, and "it was even pretty carefully figured out how much the running of the business of the station would cost and so this figure was arrived at."

This conversation between Frank and Telefunken in the summer of 1914 did not, however, constitute a contract. In order to make such a contract, it was, of course, necessary that Atlantic should take appropriate formal action. Whether because of difficulty of communication by mail, or for some other reason or reasons, it is quite clear that the agreement dated August 2, 1914 (which, by the way, was a Sunday) was not executed by Atlantic on that date. When this agreement was signed either by Telefunken or Atlantic is not clear.

I do not doubt that the agreement was signed at some time. Dr. Frank and many other witnesses in this case have appeared before me on one or more occasions, in this and other litigations, and thus I have the advantage of knowing many of the witnesses.

Dr. Frank, of course, would not testify that an instrument had been executed if that were not the fact; but he is not definite as to the date of execution, and his testimony

is that copies of the agreement were prepared in Germany and received here for signature "at the end of 1914, or the beginning of 1915," and that he signed a duplicate original "either at the end of 1914 or the beginning of 1915; probably the beginning of 1915."

It is probable that the execution by Atlantic was some time in 1915 prior to March 15, 1915, the date when Ammen, one of the directors of Atlantic, ceased to be such. However, no reference to the agreement is found in the minutes of Atlantic's board of directors, and there is no reference in the books of account to any traffic agreement until September 30, 1915. That entry made by Brauckmann, the bookkeeper, was evidently in contemplation of the traffic agreement of May 31, 1916, as will appear infra.

The failure to enter any resolution in respect of the agreement of August 2, 1914, or to keep the books of account with reference thereto is strongly corroborative of the view that the agreement in question was made as a mere intercompany matter and not at arm's length and was really only a written assurance to Frank that he could hold enough on this side of the water to pay obligations incurred.

With the exception of the holdings, if any, of Ostheimer and Stollwerck, concerning which there is no satisfactory proof, Telefunken, as the practically sole owner of Atlantic, was entitled to all the profits and obviously would be compelled to pay all the losses. It was merely contracting with itself. Such a contract might be held good as against third parties, if there were a minority stockholding interest of any consequence. It might then be urged that Telefunken did not intend to let a minority interest get the full benefit of its investment; but, as pointed out supra, the minority interest, if any, was inconsequential.

It is not possible to search the minds of the Telefunken officials at Berlin, in order to determine whether, as urged by plaintiffs, the agreement had some sinister or ulterior purpose and object.

Confining interpretation of the relations of the parties to what is disclosed by the testimony the solution is simple. Atlantic, i. e., Frank, was bound in honor to transmit all receipts to Telefunken at Berlin. In the summer of 1914, Berlin and Frank said to each other that the success of transatlantic radio communication was doubtful, that "it was by no means sure" whether "successful and reli-

able communication with Germany" could be established. Frank here in the United States did not wish to remit gross receipts to Berlin and bear the burden here of the possible embarrassment of unpaid bills.

Thereupon, Berlin said, in effect, "Very well, we have pretty carefully figured the cost of running the business and to safeguard you, we will guarantee you $100,000 out of revenues and besides you will have a claim to certain percentages, if the business warrants, and this will no doubt protect you in the payment of your bills in accordance with the developments of the business."

This understanding, in no way, changed the rights of Telefunken as long as it owned the Atlantic stock. After bills were paid, Telefunken, as either the sole stockholder or nearly so, would be entitled to every dollar (or nearly so, as the case might be,) of profit, if any, which Atlantic made, and, as between it and Telefunken, the agreement from a practical standpoint meant nothing, except that Atlantic was not called upon to remit to Berlin the gross receipts, but could hold part of them as a safety fund against obligations incurred.

This view is further enforced by the fact that the agreement did not apportion nor speak of profits, but only related to tolls, i. e., gross receipts.

In this view of the matter, the cases discussed by counsel and by the learned special master do not seem to help either side.

The point here is that Telefunken contracted with itself solely to assure the managers of its American company that they could retain some of their gross receipts to pay bills, the equity, residue, or profit always belonging to Telefunken, as matter of law, by virtue of its stock ownership. It would, indeed, be a troublesome doctrine if such an agreement would prove a barrier to the enforcement by a creditor of his right to reach profits.

Foreign or domestic interests could organize subsidiaries of which they owned the entire stock, then use patented inventions as they pleased, and gather in the profits, while infringement creditors would be without remedy for the use of the very inventions which created the profits. Rather than permit such a result, equity will be keen to remove any obstacle which stands in the way of a just remedy.

It is, therefore, held that the agreement of August 2, 1914, must be disregarded as affecting the rights of plaintiffs.

The agreement, dated May 31, 1916, is, as matter of law, in the same position. It may be assumed that the agreement was executed by Atlantic on or about the day it bears date. It was evidently contemplated as early as September, 1915, as appears from the letter to Dr. Schnitzler dated September 13, 1915, and by the entry in the books by Brauckmann dated September 30, 1915.

That agreement required Telefunken to pay to Atlantic an annual sum of $100,000 in quarterly payments of $25,000 each, and made some other changes of no consequence in this controversy. Dr. Schnitzler, a director of the Atlantic, but not a stockholder on his own account, objected to the provision as to the "guaranty" of $100,000 out of revenue. He wanted an absolute "guaranty" of $100,000 "because the traffic receipts were absolutely insufficient to allow any such payment. I think they amounted in the first year to about fifty percent only of $100,000."

Thereupon, he submitted the agreement dated May 31, 1916, to the board of directors, and this agreement was executed by Herman A. Metz, president, and Dr. Frank, secretary.

Stock had been offered to Metz to qualify him, but he refused to accept stock as a gift and paid $10,000 for 100 shares. The capital stock was: Authorized 2,000 preferred and 3,000 common; issued 1,250 preferred and 2,700 common.

Thus, it will be seen that the Metz stockholding was but a small fraction of the total, and the agreement of May 31, 1916, had no relation to apportioning receipts or profits because of this stockholding. The reason for the agreement of May 31, 1916, as stated by Metz, was the same as that given by Schnitzler. He testified: "The thing had just begun operating; we did not even know whether there were going to be any (profits) * * * It (the agreement of August 2, 1914) settled them on a percentage basis of profits, but if we had not any, we would have been in the hole here; that is the reason I understood at the time. They were guaranteeing us an income at least to cover us here."

Thus, it is seen that the fundamental purpose of the agreement of May 31, 1916, was to safeguard the payment of debts here. Schnitzler, a lawyer, Metz, a business man of standing, and the others manifestly did not wish to be placed in the position of being officers and directors of a company which might not pay its debts, and all that the agreement dated May 31, 1916, amounted to was to make doubly sure of the assurance intended by the agreement dated August 2, 1914. Indeed, the testimony in respect of the later agreement fully supports the interpretation placed, supra, on the former agreement. For the same reasons, therefore, this agreement must be disregarded.

In the operation of the station at Sayville defendant used devices in addition to the devices of the patents which were held valid and infringed in these suits.

In respect of the Fessenden reissue patent No. 12168, the master did not make any award or apportionment, because, upon his theory, there were no "sending" profits.

In respect of the Fessenden heterodyne reception patents and the Fleming patent, the master awarded to Nesco 75 per cent. and to Marconi 25 per cent.

■ It now becomes necessary to determine what apportionment, if any, is necessary both in respect of sending and receiving profits. Because of the theory on which the accounting was tried, the testimony is not complete and the case obviously should not go off on a question of evidence. Taking the master's illustration of a scale of 100, the court should have the opinion of experts as to the number of units to be accorded to such of the respective devices as may be found entitled to a number or percentage in the scale. The court is, of course, not bound by the opinions of the experts (Herman v. Youngstown Car Mfg. Co. [C. C. A.] 216 F. 604, 608), but such opinions may be helpful.

The master held that various patents for which license fees were paid had received their share of the profits, and therefore that no further investigation was necessary. In the case of "sending" profits, this view applied to the patents owned by Telefunken enumerated at pages 42 and 43 of the master's report.

In the case of "receiving" profits, the same view applied to the Telefunken patents (enumerated at pages 33 and 34 of the master's report) and to the De Forest and Armstrong patents.

The frequency booster patents, however, (Exhibits 1, 2, and 5) should have a place with the Fessenden reissue patent in the scale of 100.

So, also, in respect of profits for receiving, a place should be accorded in the scale of 100 to the De Forest and Armstrong patents; so, also, the audion as a generator of high frequency oscillations.

■ The credits in the cases at bar were allowed by the master in that regard in accordance with the principle of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000; but in that and other cases the contention in favor of such a method of calculation was always put forward by the infringing defendant. The theory was that the defendant in good faith had paid a license fee or royalty, and that this was a legitimate expense with which he should be credited and which should be deducted from the gross receipts in order to ascertain profit. No case has been called to my attention which presents the contention of the defendant in the case at bar. Pointing to the Westinghouse, Case, 225 U. S. 604, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, and the Dowagiac Case, 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398, defendant insists that each device, patented or otherwise, whether licensed or not, which has contributed to the operative and commercial success of the Sayville station, should receive its just percentage in apportionment, or, in other words, its proper unit in the scale. With this I agree. The mere fact that a defendant makes a good bargain with an outsider should not avail a plaintiff any more than should a bad bargain deprive a plaintiff of a just award against an infringer.

To illustrate, suppose that three inventions equally contribute to the useful value of a particular device, and that for one reason or another a nominal consideration was paid for one of these three inventions, and the owners of the other two obtained decrees requiring an accounting. It would be manifestly unfair to the defendant that, in such circumstances, those who contributed but two-thirds of the result should divide between them all of the profits.

The defendant in the case at bar is entitled to the benefit of such apportionment as should justly be accorded to the relevant devices other than those of the respective plaintiffs and the working out of the scale of 100 should comprehend that a percentage should be attributed to each and every device which may be held to contribute to the practical and successful operation involved.

In order to indicate what questions are still left open for consideration in accordance with the views here expressed, it is necessary to point out what devices are entitled to consideration.

1. *Sending Profits.* As indicated, supra, the only Telefunken patents regarded as entitled to consideration are the frequency booster patents, Exhibits 1, 2 and 5.

Lodge patent, No. 609,154, need not be considered for two reasons: First, it is very doubtful whether an accounting would be decreed in the suit now pending in the Eastern District; secondly, the Lodge patent expired August 16, 1915, and, even if regarded as essential to the sending operation, it was in use only from July 9, 1915, or only for about one month. To include this in the scale would merely invite a troublesome calculation over a negligible amount.

Marconi patent, No. 763,772, is in litigation between Marconi and Atlantic. The patent is owned by Marconi. Marconi is making no claim here in respect of this patent, and defendant has denied the use of both the Lodge and Marconi patents in the suit pending in the Eastern District. Without deciding the point, so as to anticipate the decision of another court, it is enough to state that the use or necessity of use of this Marconi patent in connection with continuous wave transmission as distinguished from spark operation is too doubtful to justify assigning to this patent any unit in the scale.

It will, thus, be seen that with very little additional testimony it ought not to be difficult to determine the units in the scale to be accorded, on the one hand, to the Fessenden reissue patent, and, on the other hand, to the three Telefunken frequency booster patents, and those four patents will be the only ones considered in the apportionment of the sending profits.

2. *Receiving Profits.* It may be stated again that the essential object sought to be attained, which in fact was attained, was the practical success of transmitting messages from Nauen to Sayville and vice versa. To this success, the De Forest audion and Armstrong feed-back circuit contributed as did the Fleming patent and the Fessenden heterodyne reception patents. I am of opinion that all of these patents must be considered in the scale. So far as the Lodge, Marconi, Lee, and Hogan and Vreeland patents are concerned I agree with the conclusions of the master. So far as all of the Telefunken patents in relation to receiving are concerned (except Exhibit 26), I am of opinion that they were not essential to the receiving operation here employed and they will be eliminated from the scale.

I have excepted Exhibit 26 not necessarily in order to give the Arco and Meissner pat-

ent a place in the scale, but merely to indicate that, when the apportionment is being worked out, consideration must be given to the characteristic of the audion to act as a generator of high frequency oscillations. Which patent or patents may be advantaged by this characteristic and to what extent are questions for later determination. I mention the point to bring it to the mind of counsel as one for consideration in connection with the proper place in the scale to be accorded to the Fleming, Fessenden, De Forest, and Armstrong devices used by defendant in reception of signals at Sayville.

From the foregoing it will be seen that, in any event, the accounting figures must be re-cast and that further testimony should be adduced along the lines indicated. This testimony may be taken before the court in the first instance.

NOTE.—I am inclined to think that not much further testimony will be required, and, if counsel will confer with me, I will be glad to indicate in what respects I desire to be further informed.