## DOOLEY IMPROVEMENTS, Inc., v. MOTOR IMPROVEMENTS, Inc.

No. 957.

District Court, D. Delaware.

Jan. 27, 1937.

See, also, 6 F.Supp. 161.

Hugh M. Morris, of Wilmington, Del., and John M. Zane and Harold W. Norman (of Zane, Morse, Zimmerman & Norman), both of Chicago, Ill., for plaintiff.

Robert H. Richards (of Richards, Layton & Finger), of Wilmington, Del., and Theodore S. Kenyon and Frederick Bachmann (of Kenyon & Kenyon), both of New York City, for defendant.

NIELDS, District Judge.

This is a patent suit charging Motor Improvements, Inc., with infringement of United States letters patent No. 1,847,817 granted on March 1, 1932 to Don Cole, assignor to Dooley Improvements, Inc., the plaintiff. The patent is entitled "Lubricating System." The answer denies infringement and challenges the validity of the patent. The answer also asserts a counterclaim charging plaintiff with unfair practices.

There is no evidence as to the character of plaintiff's business, if any. There is no evidence that plaintiff ever made or sold the lubricating system of its patent.

Defendant was organized in 1923. For eleven years, as exclusive licensee under the Sweetland patents it has manufactured and sold an oil filter called "PurOlator" to the number of 9,000,000. These filters are standard equipment on Chrysler, Buick, Oakland, and other cars. Defendant's filter consists of a casing containing a canton flannel bag compactly arranged into a spiral or helix. Thus there is provided a filtering area which is many times the cross-sectional area of the casing itself. In addition, defendant's filters are

sold for use in lubricating systems so arranged that at a given time only a minor portion of the oil from the engine is passed through the filter. As a result, defendant's filters achieve the slow seepage of oil over an extensive area which produces true filtration.

### History of Cole Patent.

The application for the Cole patent in suit was filed December 18, 1918. It was prosecuted fruitlessly for nine years. A variety of claims were asserted, none of which were addressed to the subject-matter of the claim now appearing in the patent. A study of the file wrapper shows the unrelated and unimportant things Cole was seeking to patent during the ten years before the interference was declared. It is an extraordinary record of versatility.

In the original Cole application the claims were for a filter directly in the line of the bearings, i. e., for a device filtering the entire flow of oil from the engine to the bearings.

On rejection, new claims were filed in January, 1920, featuring the withdrawal of water.

On rejection, all the claims were canceled and in May, 1920, a single claim was presented and characterized with the statement that "there is one clean cut novel idea in this case and the present single claim has been drawn to that idea." The idea was to force "the filtered lubricant directly upon the bearing surfaces to lubricate the same and wash out any grit."

On rejection, four new claims were inserted in May, 1921, featuring the filter in closed circuit with the bearings. Two of these claims brought in the matter of water separation. Accompanying this, Cole said: "Applicant is not aware that he has invented an improvement in filters."

On rejection, every one of these claims was canceled and a new effort was made in July, 1922, to obtain a single claim for a gravity filter in the direct line to the bearings.

On rejection, Cole clung to the gravity filter idea and reasserted in August, 1923, the matter of water separation. This was seven months after the publication in this country of the Sweetland French patent.

On rejection, additional claims were added in October, 1924, reciting the separation of water. This was months after the adoption of defendant's PurOlator as

standard equipment on Chrysler cars and the national advertising of the event.

On rejection, all previous claims were canceled and three new claims inserted in October, 1925, limited to water removal and to means for delivering oil from the filter to the engine independently of any removed water. At this time defendant's PurOlators had been on the market for two years. They had been sold in large quantities and had been nationally advertised. Defendant's president testified: "During the year 1924 there were 34,000 delivered to Chrysler. In 1925 the combined number to all manufacturers was 380,000." Upwards of $200,000 had been spent in development work and in advertising. With knowledge of defendant's product Cole deliberately abandoned all of his earlier claims and limited his entire claim of invention to water removal. His claims remained so limited for over two years.

In July, 1926, the United States Sweetland patent issued. November 8, 1927, Cole copied claim 3 of the Sweetland patent into his application. Up to that time Cole had never claimed a "fine texture filter" or anything like it. He had never made any claim respecting the "area" of his filter, or its "capacity," or any suggestion of "correlation" as set forth in this claim.

For nine years Cole had been grasping at straws while defendant's business in PurOlators had grown by leaps and bounds. Outside of the manufacturing business promotion expense amounted to $687,000. Defendant's patents had then issued both in this country and abroad.

Cole's file wrapper demonstrates his complete ignorance of any such invention as plaintiff alleges until he copied claim 3 of Sweetland's patent in 1927. That was fifteen months after the Sweetland patent had issued. It was nearly four years after defendant's PurOlator, here alleged to infringe, had come upon the market. It was more than four years after the publication in the United States of the corresponding French patent to Sweetland. During the four years, before November 8, 1927, defendant's filter had been widely advertised and sold in great quantities. Over a million had gone into commercial use.

When Cole copied claim 3 of the Sweetland patent into his application he demanded an interference with the Sweetland pat-

342

ent. The Primary Examiner at first rejected the claim "for non-disclosure and as misdescriptive" but after oral argument he declared the interference. Sweetland opposed the declaration of the interference on the sole ground that Cole had no right to make the claim because of insufficiency of his disclosure. This issue was decided against Sweetland by the Patent Office, and, on appeal, by the Court of Customs and Patent Appeals. Sweetland v. Cole, 53 F.(2d) 709. The decision of the Court of Customs and Patent Appeals did not involve the issues respecting the validity of the Cole patent urged by defendant here. Validity was not and could not be questioned in the interference proceeding.

■ The sole question before the Patent Office in an interference proceeding is the question of priority of invention.

"The question in interference proceedings is which of the contestants was the prior inventor. The question of invention is not involved and is in fact conceded. Each party contends for the prize of being declared the first inventor. * * * We see no reason why the defendant may not avail itself fully of the defenses of lack of invention and non-infringement." Hillard v. Remington Typewriter Co. (C.C.A.) 186 F. 334, 336.

"An interference proceeding involves no question, except priority of invention as between the parties to the proceeding. * * * The opinion passed in that proceeding is therefore ineffectual to establish the construction to be given plaintiff's

patent." Dunkley Co. v. Central California Canneries (C.C.A.) 7 F.(2d) 972, 977.

■ The decision of the Court of Customs and Patent Appeals rendered between *different parties in a proceeding of limited statutory jurisdiction where the questions of validity and infringement were not involved is of no effect here.*

### Cole Patent.

■ The Cole patent was granted March 1, 1932, more than a dozen years after application filed. In his specification, Cole declares that lubricating systems do not provide adequate means for freeing the oil from foreign matter such as "metallic particles and sand, nor do they provide adequate means for separating the oil from any water which accumulates with the oil."

He briefly describes his invention:

"In my improved system I provide an associated oil filter to which I continuously pump the oil from the engine and from which I continuously pump or force the oil under pressure, after filtering, to the several points of delivery, i. e., the bearings to be lubricated.

"I am thus enabled to provide filtering means of ample capacity * * * to continuously remove from the engine the intaken sand, and at the same time to force the oil to the bearings in sufficient quantity and at sufficient pressure to cause them to be thoroughly flooded with oil."

His gravity filter, illustrated in Fig. 1, he describes:

Fig. 1

"The oil is filtered slowly with a high pressure oil delivery means. * * *

"I provide a suitable gravity oil filter 3 of sufficient capacity so that the oil will not have to be forced through the filter in order to filter it fast enough to supply a sufficient quantity for the force feed system. * * *

"I have shown it as having a metal casing 8 in the upper part of which I arrange two coned filter partitions 9 and 10, carrying suitable filtering material and through both of which the oil must pass to reach the bottom of the casing. * * *

"The lower part 12 of the casing 8 constitutes an oil storage space in which the clean filtered oil accumulates after it has passed through the filter partitions. This lower part 12 also constitutes a separator in which the oil separates from any water carried with it. * * *"

The pressure filter system, illustrated in Fig. 2, Cole describes:

cludes the relatively large filter through which the oil can flow relatively slowly."

The above extracts furnish the substance of Cole's written description. Cole's invention, if any, must be gathered from his description in connection with the patent drawings.

The Cole patent contains one claim. This claim was copied from the Sweetland patent. It reads: "In a lubricating system for an automotive engine containing a body of oil exposed to contamination by deleterious solids, means to circulate the oil to the parts to be lubricated and to a filter casing, and a fine texture filter in said casing having an area and capacity so correlated to the size of the system and the contaminating conditions under which the system is used as to remove said deleterious solids at a rate substantially equal to the rate of contamination of said oil by said deleterious solids."

By analyzing this claim it is apparent that it is for apparatus and not for a proc-

*Fig. 2.*

"The filtering partitions or walls comprise a plurality of cones 32 arranged in nested relation within the casing * * *. Preferably the cones are arranged with their smaller ends up so that the sand or grit filtered out will spread to the largest diameter thereof and thus have a minimum clogging effect."

In Fig. 2 the filtering material is not mentioned. The similarity between the forms in Fig. 1 and Fig. 2 are: "The lubricating system [Fig. 2] as in the first form, [Fig. 1] is a closed circuit or system, which includes the base of the engine, and in each instance the system in-

ess or method. The elements of the claim include:

(a) A place, denoted by the words "In a lubricating system for an automotive engine."

(b) "Containing a body of oil exposed to contamination by deleterious solids." These words describe a thing, i. e., the oil, not an act or step in a process.

(c) "Means to circulate the oil to the parts to be lubricated and to a filter casing." "Means" is a pump. The pump is a piece of apparatus being part of the combination comprising the system.

(d) "And a fine texture filter in said casing." This calls for another piece of apparatus in the combination.

(e) "Having an area and capacity so correlated to the size of the system and the contaminating conditions under which the system is used as to remove said deleterious solids at a rate substantially equal to the rate of contamination of said oil by said deleterious solids." This "correlation" phrase describes the "fine texture filter," element (d). Plaintiff's expert aptly characterized these words as follows: "The claim says that it shall have an area and capacity so correlated to the size of the system and the contaminating conditions under which the system is used as to remove the deleterious solids at a rate substantially equal to the rate of contamination of said oil by said deleterious solids. Those are a lot of words, but it simply means that you use a filter large enough to do the work, and to give you clean oil. * * *"

■ This analysis of plaintiff's claim proves that the claim is for a combination of things. Clearly it is not for an act or a succession of acts. In other words, the claim is an apparatus claim, not a process claim. It is unnecessary to belabor the point. Its importance is due to plaintiff's argument that prior art patents covering apparatus cannot anticipate a process patent. The argument is unsound. The law is well settled that a claim may be invalid by proof of prior structures similarly arranged to accomplish the same result, and it is immaterial whether the claim be couched in terms of apparatus or of process. Brown et al. v. Piper, 91 U.S. 37, 43, 23 L.Ed. 200; In re Watson (Cust. & Pat. App.) 44 F.(2d) 868, 870.

Before further consideration of the Cole specification and the Cole claim it is necessary to note particularly the fundamental difference between screening and filtering in removing deleterious solids from lubricating oil. In screening, the oil passes through the mesh of the screen with appreciable rapidity and only those particles which are too large to pass through the screen are removed from the oil stream. In filtering, on the other hand, the rate of movement of liquid is extremely slow—a mere seepage—comparable to the rate of movement of the minute hand of a watch. With the slow movement of the oil, particles which are even smaller than the openings in the filter material are held back, first by adherence to the fabric and ultimately by the formation of a porous filter bed made up of deposited particles. The slow rate of flow or seepage of the oil through the filtering material is essential to true filtration.

Defendant's expert testified:

"I might say that the Cole patent in my opinion simply shows substantially what has been done for many years, that is to say, the use of a screen that would be effective to remove relatively large particles such as particles of sand and grit.

"For that use I would say that the Cole device was perfectly operative, but it would not in my opinion be operative to remove the extremely fine carbon particles that are found in lubricating oil which are the source of contamination and which can only be removed by filtration. * * *

"The Cole patent, as Mr. Hammer points out, shows two forms of so-called filter, the one a gravity filter in Figure 1 and the second a pressure filter in Figure 2. Both of these filters are arranged directly in the oil line, that is to say, the entire lubricating oil is required to pass through the filter, that is, from 150 to 300 gallons an hour. That is an enormous amount of oil to be handled, and in order that that oil can be properly filtered at a low speed, a filter of prohibitive size would be required.

"The Court: Is that the necessary teaching of the patent? It must all go through the filter?

"The Witness: Yes, sir. It must all go through the filter. Mr. Hammer says that the art knew something else, but nothing of that kind is referred to in the patent."

Turning back to the Cole specification and claim what do we find?

■ First. The Cole patent is a paper patent and must receive a narrow or literal interpretation. All the terms of the grant must be found in the language of the grant and no additional terms can be implied. Thus the oil stream cannot be split because splitting the stream is not suggested. The use of canton flannel over the screens cannot be implied because such use is not expressly stated. A literal interpretation of the Cole patent discloses a filter that screens contaminated oil but does not filter that oil by seepage.

Second. The Cole filter disclosed is operable for screening but not for filtering. The drawings indicate what is meant

by the words of the specification "the system includes the relatively large filter through which the oil can flow relatively slowly." The size of the filter may be estimated by comparison with the size of the engine. In endeavoring to follow Cole's disclosure plaintiff's witnesses built two filters illustrated in blue prints in evidence. One filter has an internal diameter of 3¾"; the other an internal diameter of 7½". The partitions illustrated by Cole are only slightly larger than the cross-sectional area of the casings. The area of the partition in one filter would be about 12 square inches and in the other filter about 45 square inches. Cole nowhere intimates how slowly the oil is to pass through the casings. Obviously the oil must pass through the casings more slowly than through the delivery pipes. However, there is a limit to the slowness. Cole emphasizes the importance of forcing the "oil to the bearings in sufficient quantity and at sufficient pressure to cause them to be thoroughly flooded with oil" and he speaks of delivering the oil to the bearings "in ample or even excessive quantity." Plaintiff's expert gave as typical that the "Buick engine circulates about 150 gallons per hour."

Thus in the filter or system disclosed by Cole the oil must have been intended to pass through the partitions at a rate of at least 150 gallons per hour—a rate shown to be completely outside the range of true filtering velocities. At such a rate the sand, metallic particles, and grit might be screened out. It does not approach the slow seepage of oil through filtering material that is characteristic of defendant's filters where only a small fraction of the total oil flow is handled at a time and the filtering surface is many times the cross-sectional area of the casing.

Third. What is "suitable filtering material"? Plaintiff's expert says it means filter cloth. Recalling that Cole is a paper patent, no such meaning can be implied. It is certain that such a meaning is not expressed. But the Supreme Court dealt with the word "suitable" where a patent described a darning device as provided with a suitable holder. It was contended that the term would be understood to mean a hollow cup-shaped holder. The court found the expression did not comply with the requirements of U.S.R.S. § 4888 (35 U.S.C.A. § 33), saying: "The specifica-

tion of a 'suitable' holder certainly covers none of these alleged essentials. These omissions emphasize the failure to make the fair disclosure demanded by R.S. § 4888." Stelos Co. v. Hosiery Corporation, 295 U.S. 237, 242, 55 S.Ct. 746, 748, 79 L.Ed. 1414.

Fourth. What is a "fine texture filter" referred to in the claim? Defendant's expert referred to the Richardson-Phoenix gravity filter as like Cole's Fig. 1. It employs filter cloth It has a filtering capacity of over 50 to 100 gallons per hour, about one-half that required to flood Cole's bearings. For this purpose it requires an area of 48 square feet, nearly 150 times greater than Cole's 45 square inches. The filtering rate in Richardson-Phoenix filter is several hundred times slower than the filtering rate indicated by Cole's disclosure. How fine must the texture of Cole's "suitable filtering material" be in order to let the oil flow through the same 200 or 300 times as fast as it flows through the cloth filter bags of the Richardson-Phoenix gravity filter? Cole's disclosure does not answer.

What is the effect of importing this Sweetland claim into the Cole patent?

(1) There is no disclosure in the specification or drawings of a "fine texture filter" as called for by the claim. The specification does not disclose "correlation." In short, the specification does not support the claim. Therefore the claim is invalid because claiming something not described in the written specification. U.S.R.S. § 4888 (35 U.S.C.A. § 33). Stelos Co. v. Hosiery Corporation, 295 U.S. 237, 55 S. Ct. 746, 79 L.Ed. 1414.

(2) The claim is for new matter added by amendment to the application and unsupported by a supplemental oath. Therefore the claim is invalid. Steward v. American Lava Co., 215 U.S. 161, 30 S.Ct. 46, 54 L.Ed. 139.

(3) The Cole disclosure cannot be made operative by radical changes, such as the employment of a divided stream and the use of fine-texture filter cloth. Patentability cannot be predicated upon such a reconstruction of the device.

"Utility is absent from all processes and devices which cannot be used to perform their specified functions, and patents for such subjects are therefore void. This rule applies even to cases in which, by simply adding new elements to useless con-

trivances, highly useful inventions are produced." Walker on Patents, 6th Ed. § 118, p. 146.

"Furthermore, we are strongly of opinion that claim 5, as taken bodily from the co-pending application, is an interloper in this patent, and finds no suggestion or support in the specification. It is like the cowbird's egg deposited in the nest of another bird. It simply 'does not belong.'" Cleveland Gas Burner & Appliance Co. v. American Heater Corporation (C.C.A.) 38 F. (2d) 760, 763.

Courts do not look with favor upon enlargements of an application in order to appropriate other inventions and what has gone into public use.

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use." Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053.

This is precisely what the plaintiff is attempting to do here.

### Prior Art.

The statements which Cole used to describe what he hoped to accomplish were common in the prior art. There was nothing new in the assertion that clean oil was obtained, or that the filter was of ample capacity, or that the bearings were flooded with clean oil, or that suitable filtering material should be used. In common with these prior patentees Cole disclosed nothing more than the removal of relatively coarse materials, such as sand, metallic particles, and grit.

United States patent to Winton & Anderson No. 925,258 granted June 15, 1909, embodies every element of the claim in issue construed in the light of the Cole specification. Like Cole's Fig. 1, this patent discloses a gravity system in which the oil drops through two screens in the casing just as the oil drops through screens 9 and 10 of Fig. 1 of the Cole patent. The casing of the so-called filter is large enough to act as a reservoir to contain the entire body of oil. Winton & Anderson make their feed pump "of greater capacity than the distributing pump, which absolutely prevents any accumulation of oil in the crank-case" just as

Cole makes his "drain pump 7 of slightly greater capacity than the maximum delivery of the pressure pump" for exactly the same purpose. Winton & Anderson state they use "a flushing quantity of oil to the bearings." This statement is like Cole's statement that his apparatus will " * * * deliver the oil in the best possible condition to the bearings and in ample or even excessive quantity." Winton & Anderson state "over-lubrication by splash is prevented." This statement is like Cole's statement that his arrangement "prevents the grit which has been washed down from being carried back to the bearing surfaces by splashing." Winton & Anderson specify "a suitable oil-filter" and Cole similarly states that the "filter 3 may be of any suitable construction." In Winton & Anderson the oil "falls through the filtering or screening surfaces" and "circulation of the oil is insured to the bearings of the engine in large quantities." Cole expresses the same thought by saying "I provide a suitable gravity oil filter 3 of sufficient capacity so that the oil will not have to be forced through the filter in order to filter it fast enough to supply a sufficient quantity for the force feed system." While Winton & Anderson do not state specifically the fineness of the screen used they describe the partitions as intended for "screening or filtering." This expression is as definite as Cole's reference to "suitable filtering material." Neither the words "fine texture" nor their equivalent occur anywhere in Cole's specification. It is impossible to find a single point on which to base any novelty in the apparatus of Cole's Fig. 1.

Cole's pressure filter or system is anticipated in Winton United States patent No. 923,747 granted June 1, 1909. This patent shows a "filter" corresponding in all essentials with the pressure filter of Cole's Fig. 2. A pipe is connected with the pump to take the oil from the crank case and force it into the filter casing. The casing contains a plurality of screens corresponding with Cole's screens After passing through the screens the oil is discharged through a pipe which connects "with the oil-distributing mechanism." By passing the oil through the filter "any sediment contained in the oil" is removed and the oil is fit to be "used over and over again." The area of the filtered screens shown in Winton is so large in relation to the size of the pipes entering and leaving the casing that the flow rate through

the screens must have been at least as slow as Cole's for a given flow rate through the pipes. The description of Winton's operation is no less suggestive of "fine texture filter" than Cole's. Certainly Winton's device was intended to be "large enough to do the work." Its disclosure is every bit as adequate to support the claim as Cole's.

Winton British patent No. 13,187 granted December 5, 1907, shows all the essentials of Cole's Fig. 2. The idea expressed in the Cole specification of supplying oil in "ample or even excessive quantity" and of supplying the engine with "clean oil" are sufficiently set forth in the Winton application. With a view to attaining these objects Winton pumps his oil through the cleansing device by means of a pump and pipe. The oil leaves the cleanser through a pipe connection by which it is conveyed "to the various points to be lubricated." The cleansing device comprises a long cylindrical casing having a large number of screens. The three top screens are provided at their under side with "one or more layers of suitable cloth," so that the oil, after percolating upwards through the water and through the perforated discs, is forced through these layers of cloth before it passes out. Particles of foreign matter will be deposited in the bottom of the cleaner and upon the lower perforated discs "and any foreign matter which may remain in the oil will be finally removed by being forced through the layers of fabric attached to several of the perforated discs." The patent states that the oil after the foregoing treatment is "thoroughly cleansed and ready to be again used for lubricating purposes without any injury to the parts supplied therewith." Having in mind that Cole does not limit himself to any particular · form of filter, this Winton patent appears to anticipate every smallest detail of his combination, even down to the "fine texture filter" which Cole does not disclose.

The Cole patent is plainly invalid over the prior art. The foregoing prior art patents were before the Circuit Court of Appeals for the Sixth Circuit in the suit of Motor Improvements v. General Motors Corporation, 49 F.(2d) 543. Upon motion for rehearing in that case the court said: "Cole's purely paper device is at the best but cumulative evidence to the alleged anticipations considered in the opinion heretofore announced." The court saw in Cole nothing that approached Sweetland closer than these prior patents.

### Counterclaim.

Defendant has failed to prove damages occasioned by the alleged acts .of unfair competition on the part of the plaintiff. The counterclaim will be dismissed.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½.

The bill must be dismissed.