## FESSENDEN v. RADIO CORPORATION OF AMERICA.

### No. 1054.

District Court, D. Delaware.

March 24, 1938.

E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., and Samuel E. Darby, Jr. (of Darby & Darby), and Paul Kolisch, all of New York City, for plaintiff.

William G. Mahaffy, of Wilmington, Del., Abel E. Blackmar, Jr. (of Sheffield & Betts), of New York City, and Jo. Baily Brown, of Pittsburgh, Pa., for defendant.

NIELDS, District Judge.

This is a suit by Helen May Fessenden, as administratrix of the estate of Reginald A. Fessenden, charging Radio Corporation of America with infringement of two patents: No. 1,617,240 granted to Reginald A. Fessenden February 8, 1927, on application filed January 28, 1922, for "Method of Wireless Directive Signaling" (hereinafter called the first patent); and No. 1,617,242 granted to Reginald A. Fessenden February 8, 1927, on application filed October 13, 1924, for "Wireless Transmission and Reception" (hereinafter called the second patent). The defenses are invalidity and noninfringement.

Fessenden was a pioneer in wireless. He contributed to the scientific as well as the commercial development of radio. He is the accredited inventor of the "heterodyne" receiving circuit.

Radio started in 1864 with the theoretical work of the English mathematician James Clark Maxwell. He demonstrated that light travels through space in the form of extremely short electromagnetic waves and that there are other electromagnetic waves that travel through space at the same speed but are longer and therefore invisible. In 1888 Heinrich Hertz proved the correctness of Maxwell's theory by demonstrating that these invisible electromagnetic waves exist and that they follow the ordinary laws of light waves. Hertz generated electromagnetic waves from 1 to 10 metres in length. He used small apparatus. The smaller the apparatus, the shorter the wave length. Marconi transferred Hertz' work from the laboratory to the practical field. He increased the distance these waves could be transmitted by connecting one side of the spark gap to a metal plate buried in the earth, and the other side to a wire extending vertically to a considerable height. Hertz connected a small horizontal antenna with his spark gap and transmitted short horizontally polarized waves a few feet. Marconi's structure produced long and vertically polarized waves. By 1898 Marconi transmitted electromagnetic waves 14½ miles; by 1901, 200 miles; towards the end of 1901, he spanned the Atlantic ocean. In 1899 Marconi announced that the distance to which signals could be sent varied with the square of the length of the vertical antenna. Investigation by others corroborated the correctness of Marconi's conclusions. In keeping with this teaching defendant erected at its Tuckerton Station an antenna tower 835 feet high operating on a wave length of about 16,000 metres.

Wave lengths below 200 metres were assigned to amateurs. Occasionally they received some transatlantic signals but the signals were regarded as freaks. Between January, 1922, and November, 1926, the radio art adopted wave lengths between 14 metres and 214 metres for long distance commercial communication. The use of waves of these lengths for long distance communication was well known to the art and numerous descriptions thereof were published. For example, Radio Broadcast of July, 1925, contained an article by Marconi. Here he said: "It was reserved for the years 1923 and 1924 to show conclusively that such short waves could, and did, perform efficiently and reliably most of the things which the experts had considered until then either impossible or impracticable. * * * The cycle of radio investigation sweeps back to something very similar to that of the first radio experiments."

Original Application for First Patent.

January 28, 1922, Fessenden filed his original application for a patent entitled "Wireless Direction Finding":

"My invention relates to finding direction by wireless, by means of the so-called Fessenden Pelorus, and has for its object greater efficiency in finding direction by this method, and more particularly the elimination of errors, and greater reliability of indications.

" * * * applicant has found that still other sources of inaccuracy remained, and that the readings still occasionally failed to give the true direction. Applicant has now traced the causes of these errors to the presence of wire guys, smokestacks,

deckhouses and the like; and possibly other causes, for the sources of error seem almost to be inexhaustable, and some are variable, due to salt water on masts, etc.

"But whatever the cause, applicant has experimentally discovered that all of this latter type of error source is substantially eliminated if the wave length of the directive signals is shortened down far below what is now, or has been heretofore, used, i. e. if, instead of using a wave length of 10,000 metres or of even 1,000 metres, or even 300 metres, which last is now considered a very short wave length, the wave length is shortened down to the order of 5 (five) metres. If this is done the results obtained seem very reliable, especially if two wave lengths are used, say 5 metres and 8 metres; or 4 metres and 7 metres; both wave lengths being of the order of magnitude of 5 metres, or even less.

"Applicant is not aware of the reasons why these wave lengths give so much more reliable results. Possibly, or even probably, it is partly due to the fact that wave lengths of this order of magnitude are not affected by neighboring conductors, as stays, etc. unless in close proximity; and even when in proximity the fact of disturbance is indicated by the different ratio of intensities on the two wave lengths. Also it may be that the neighboring conductors, as guys, etc. are of a longer natural period than the order of magnitude of 5 metres and so are not absorbed or bent to any great extent. Whatever the reason, experiment shows that the results obtained are so reliable that all difficulties of this method of direction finding appear, at present, to be overcome."

Hogan, a witness for defendant, sums up the disclosure of this application: "What Fessenden teaches in that application as it was filed is that he thought or proposed that by using wave lengths of the order of magnitude of 5 metres length, one could avoid the errors in bearing or direction finding that had before that date been encountered when longer waves were used for wireless direction finding."

Direction finding was a well-known use of radio signaling before 1922. It involves the determination of the line between a given receiver and a given transmitter, for example, between the radio compass aboard ship and beacons in the harbor. Bearings of nearby stations are sufficient for triangulation whereby you can locate the ship and the channel of the harbor in a fog. The disclosure of the application was addressed to a real problem. Any method or apparatus that obtained the results then claimed by Fessenden would have been a valuable invention.

This application was directed to the problem of avoiding errors "in determining direction by wireless." The sources of error were stated as wire guys, smokestacks, deck houses, etc. Applicant proposed to avoid these errors by utilizing wave lengths of the order of 5 metres, mentioning 4, 5, 7 and 8 metre wave lengths. Applicant stated, "much more reliable results" were secured "due to the fact that wave lengths of this order of magnitude are not affected by neighboring conductors." The original disclosure of this application was with respect to direction finding and short distance work. Five-metre waves can be used only up to 15 miles in direction finding.

Five radio engineers testified what wave lengths were comprised in the expression "of the order of 5 metres":

Hansell said he would understand a range of 4 to 6 metres.

Beverage said plus or minus 20 per cent.

Pickard testified:

"Q 15. You have just used an expression 'wave lengths of the order of 5 metres.' Please tell us what you mean when you say 'wave lengths of the order of 5 metres'? A. * * * A wave length of the order of 5 metres, would mean to me waves not longer than twice 5 metres, or shorter than ½ of 5 metres; that is, waves which would certainly be comprised between 2½ and 10 metres.

"Q 16. Would you under any construction of the term, 'of the order of 5 metres' that you have used, or which you know to be used, include within that expression waves of a length of 50 metres? A. I would not."

Hogan said that from the application as filed he would have understood a range between 4 and 8 metres, or possibly shorter than 4; in 1922 a range of 2½ to 10 metres; but by the fall of 1926, being familiar with the physical properties of short waves for long distance communication, he would have accepted 4 to 8 metres.

Kelly, plaintiff's expert, when asked what band of wave lengths he understood to be included in the term "of the order

of 5 metres," answered in his rebuttal testimony: "I shall have to reply that it is indefinite. I would not set definite limits on it."

Amendment of Application in 1926.

November 9, 1926, Fessenden filed an amendment to his application of January 28, 1922. For the first time Fessenden attempted to explain the words "of the order of 5 metres" in this amendment by saying he meant thereby a range of 1 to 50 metres. In the amendment he intimated for the first time that the use of such waves was advantageous for long distance communication. Before November 9, 1926, Fessenden talked only of direction finding with waves of the order of 5 metres. After November 9, 1926, he talked only of long-distance communication on wave lengths of 1 to 50 metres. Until November 9, 1926, his invention was said to relate only to direction finding. By the amendment Fessenden canceled in toto his original application. He rewrote and expanded his original application to include entirely different subject matter.

In this amendment Fessenden changed the title of his application to "Methods and Apparatus for Wireless Directive Signaling." In the amendment Fessenden said:

"The cause of the erratic transmission of the waves, which had prevented, up to that time, [1899] transatlantic wireless communication, * * * was found, [among other things] to be a function of the wave length, and to be much less for wave lengths above 4,000 metres. * * * in spite of the discovery and publication by applicant of the 'singular point' in the transmission curve above wave length 4,000 metres, no one had, until applicant's discovery and invention and disclosure, suspected the existence of another singular point below 50 metres. * * * no reason being known at that time for suspecting that waves of the order of 5 metres would be more efficient than those of 25 cm.; in fact it was assumed to be merely a question of preventation of interference. * * *

"The surprising fact was then discovered that there was another singular good transmitting section, in addition to that above 4,000 metres previously discovered by applicant; and that this second singular band or section covered very closely the range from about 1 metre to about 50 metres; i. e. was substantially of wave lengths of the order of 5 metres. These wave lengths had been used extensively * * * and had come in very loud at Jersey City from Washington and vice versa. The fact that they had not come in when the wave length was raised above 50 metres or below 1 metre had led to the assumption that the results were of the well known 'freak' character, * * *.

"What the cause of this discovery of applicant's may be, applicant does not know, * * *. But whatever the cause it is now certain, * * * that there is a band of wave lengths which is abnormally favorable to transmission and which is of the order of 5 metres. The latest and most reliable results obtained in 1926, show that the band extends apparently, at its maximum transmission efficiency, between 40 metres and 4 metres. See for example the curve, given by Dr. Taylor of the Western Electric Co. on p. 954 of the 'Radio News' for January, 1926 which shows the phenomenon discovered by applicant very clearly."

The amendment of November 9, 1926, was offered by defendant primarily to prove a radical departure by Fessenden from the disclosure of his original application of January 28, 1922. Before adverting to that subject, five misstatements of fact, indulged in by Fessenden, must be pointed out.

(1) In the amendment he mentions his "discovery and publication of the singular point in the transmission curve above wave length 4,000 metres." Of this Hogan testifies: "In all the measurements that have been taken since the date of this paper, 1908, it has never been possible, so far as I have heard, or been able to learn, to confirm this idea of a 'singular point' at 4,000 metres, or at about 4,000 metres." In short, there is no such singular point.

(2) Fessenden says in his amendment: " * * * this second singular band or section covered very closely the range from about 1 metre to about 50 metres." All the experts agree that there is no singular band covering waves from 1 to 50 metres. The band from 14 to about 214 metres has a very distinct and useful characteristic. The band below 14 totally lacks the characteristic of the band from 14 to 214 metres.

(3) Fessenden says in his amendment that waves from 1 to 50 metres came in very loud between Jersey City and Wash-

ington. With the best of modern apparatus, waves of 3 metres have to be relayed twice to carry signals between New York and Philadelphia. However, waves over 50 metres have been used for a long while in transoceanic work.

(4) In this amendment Fessenden says the band extends "at its maximum transmission efficiency, between 40 metres and 4 metres." All the experts agree that waves below 14 metres cannot be used efficiently for long distances, and that maximum efficiency comprehends a band from 14 to 75 metres.

(5) Lastly, Fessenden speaks of "Dr. Taylor of the Western Electric Co." Dr. Taylor never was with the Western Electric Company. Since the war he has been with the Navy.

### First Patent.

The significant passages in the amendment of November 9, 1926, are to be found in the issued patent. The claims as originally filed referred only to wave lengths "of the order of 5 metres." The claims in the patent as issued include all waves of lengths between 1 and 50 metres. Here is a distinct departure and the insertion of new matter by amendment. Fessenden sought by amendment to expand his 1922 disclosure of a short distance direction finding scheme using 5 metre waves into a long distance 1 to 50 metre wave communication system.

The first patent reads in part:

"My invention relates to methods of directive signaling by wireless * * *.

"Shortly after 1914, * * * applicant investigated his records on the lower wave lengths, i. e., between three hundred (300) metres and a few centimeters. * * *

"To his great surprise, he discovered what had hitherto been unsuspected by himself, and apparently by anyone else, i. e., that there was a very short so to speak, transparent band of wave length lying between fifty (50) metre wave length and one (1) metre wave length.

" * * * it is now certain, * * * that there is a band of wave lengths which is abnormally favorable to transmission and which is of the order of five (5) metres. * * * "

Claim 1 is typical: "1. The method of obtaining increased transmission efficiency in directional wireless signaling which comprises transmitting the signals by electric waves shorter than fifty metres

wave length and longer than one metre wave length, such waves having a relatively high transmission characteristic whereby said signals are transmitted with much less disturbance by injurious atmospheric effects."

In 1924, 1925, and 1926 radio communication was using waves under 50 metres for long distances. This use was a world wide development. In 1922 Franklin referred to short distance radio communication on 15-metre waves. In 1924 Marconi transmitted daylight signals across the Atlantic on 32-metre waves. Early in 1925 defendant was engaged in commercial world wide radio communication on wave lengths less than 50 metres. In the summer of 1924 a London congress discussed short wave communication from England, France, Germany, and the United States to South America. From 1922 to 1926 numerous publications discussed the uses, advantages, and technical features of short wave lengths for long distance communications, including wave lengths from 50 metres down to about 14 metres. Fessenden expanded his application by the amendment of 1926 to sweep in the later work of others.

Fessenden speaks of hundreds of experiments made between 1899 and 1918. Most of Fessenden's assistants are alive and could have testified to these supposed experiments and their results. None of these assistants were produced. Plaintiff's own expert admitted that Fessenden could not have secured the results claimed. Fessenden either did not make the experiments or he did not get the results asserted.

Fessenden speaks of giving the results of his work to General Electric Company and others. What results did he give? Not that waves of 4, 5, 7, and 8 metres are suited either to direction finding or to long distance work because they are not. He did not tell them that waves between 14 and 50 metres are suited to long distance work because he nowhere intimates that he had any such thought until after 1926 when they were in commercial use and this use was known to the public.

### Law (First Patent).

■ The first patent is invalid because the patentee departed from his original application and expanded the subject matter thereof. In a recent case this court considered the matter of an expanded

specification and claims, saying: "Courts do not look with favor upon enlargements of an application in order to appropriate other inventions and what has gone into public use. 'Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use.' Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053. This is precisely what the plaintiff is attempting to do here." Dooley Improvements v. Motor Improvements, 18 F.Supp. 340, 346.

The Circuit Court of Appeals for this circuit has held:

"In the final analysis, the decisive questions involved in this case are, first, was the invention of the claim disclosed in the original specification? And, second, if not, can the invention of the claim, in use for two years before an amendment disclosing it for the first time, be patented by grafting it onto the original, nondisclosing application?

"The duty of careful scrutiny in such cases was referred to by this court in Hestonville [etc., R. Co.] v. McDuffee (C.C.A.) 185 F. [798] 802, where it was said: 'When, therefore, a patentee, seven years after his original application'—in the instant case two years—'and enlightened by such intervening years of progress, seeks not to prosecute his original application, but to amend the same, and on the basis of such amendment to make claims of a different character from those originally made, it becomes the duty of a court to zealously and jealously scrutinize such belated application.'" Lopulco Systems v. Bonnot Co., 24 F.2d 510.

It is significant that other Fessenden patents have been invalidated in other circuits because of departure from the original application. In National Electric S. Co. v. Telefunken Wireless T. Co., D.C., 209 F. 856, 864, the trial judge, regarding a certain receiving circuit, said: "In June, 1902, two and one-half years after the original application, the specifications were amended so as to include the tuning of the closed circuit," etc.

After discussing the facts, the court held that there had been an invalidating departure by the addition of new matter and by claims not directed to the original invention, saying: "Besides, the rule as to amendments may have for its justification a protection to the intervening art, but it does not depend in its application upon a showing that there is such an art to be injuriously affected; it is enough that the applicant makes some radical change of base. I have no doubt that he did in this case, and this disposes of the tuning claims in suit."

In Kintner v. Atlantic Communication Co., 240 F. 716, 719, the Circuit Court of Appeals of the Second Circuit, considering Fessenden patent, No. 918,306, held that Fessenden had changed his disclosure by adding new matter during prosecution of his application, saying: "The file wrapper shows that the original application nowhere used the word 'definite,' expressed a preference for a receiver tuned both electrically and mechanically, and asked to cover by claim 'the production of signals by groups of impulses having a group frequency higher than commercially used alternating current frequencies,' which means (as explained by the specification) that Mr. Fessenden thought himself the first to 'get through' static by means of frequencies rising to about 900 per second, or at any rate exceeding 250."

The court, after observing that the application remained in the above form until later when an amendment was filed in which "definite frequencies" were for the first time disclosed and claimed, said:

"Of these undoubted occurrences it is to be noted that, if definiteness was always a part of Fessenden's method, the belated appearance of the word 'definite' in the description or definition thereof does not deprive him of the benefit of the same; but if, in truth, the requirement of 'definite group frequency' constituted a departure from an addition to the original disclosure, it was not supported by the statutory oath and the claims are unlawful. * * *

"Finally, there is no evidence that the patentee had any idea that definite—i. e., regularly and uniformly recurring—wave groups were a part of his invention when he filed application, nor until March, 1909."

When file wrappers of two Fessenden patents were discussed the court held the idea of tuning had been inserted in the applications by Fessenden after he had read a paper describing that subject matter published by Marconi. Marconi Wireless

Tel. Co. v. National Electric Sig. Co., D.C., 213 F. 815.

In considering new matter in a Fessenden patent the court said: "It is also important to remember that in the early stages of an art of this kind discoveries are being made rapidly and constantly, and therefore the file wrapper assumes an importance which is often absent in many cases; for when the date of an invention and the clarity of disclosure are in serious controversy the courts must be vigilant to prevent a result by which after-acquired knowledge, in a swiftly developing art, gives to a patentee that valuable control which would not have been his but for a later, or, if not later, a newly expressed, thought which he seeks to antedate." Kintner v. Atlantic Communication Co., D.C., 230 F. 829, 830.

In still another case the court said: "Apparently Fessenden supposed that he could work out continuous generation with the spark gap as well as with the dynamo without the spark gap; or, it may be, that this was in the nature of an anchor to windward in the characteristically Fessenden hope of covering everything which might thereafter be discovered or invented." Kintner v. Atlantic Communication Co., D.C., 249 F. 73, 76.

The first patent is invalid for another reason. The original specification described the use of waves "of the order of 5 metres" to avoid errors that were known to exist in radio direction finding. Such waves do not avoid any such errors and, in fact, would be less useful than the longer waves already in use. Therefore, as Fessenden failed to solve the problem to which the original application was directed, he failed to make an invention.

### Second Patent.

■ The second patent is entitled "Wireless Transmission and Reception." Claim 1 is typical and reads: "1. In wireless signaling, the method of increasing the reliability of operation and diminishing errors and disturbance, which comprises transmitting the wireless signals by horizontally polarized waves projected from the sending station at an angle substantially inclined to the plane of the earth's surface at said sending station."

Transmission and reception of horizontally polarized waves were known and used in the prior art. There was no invention in applying horizontal polarization to short waves or in transmission or reception at a tilt angle.

The patent teaches projecting the horizontally polarized waves at a substantial angle and receiving them at a substantial angle. It teaches the projection, for example, with a parabolic reflector as shown in the patent, of horizontally polarized waves at a definitely selected angle to the horizontal plane of the transmitter, and the receipt of those waves, still horizontally polarized, at the same angle at a receiver arranged to concentrate horizontally polarized waves arriving at that particular angle.

There is no teaching of what angle to use at either end. The record shows that all antennas used in long distance communication inevitably send and receive at an angle. The correct angle is still a matter of experiment in each case. This matter of tilt angle of the signal carrying waves is not peculiar to horizontal polarization. It is involved in exactly the same way and to the same degree with vertically polarized transmission. It has been known for a long while to be incident to all long distance radio transmission.

All the claims contain a limitation involving travel of the signal waves at a substantial angle. Such angles are necessarily involved in all long distance communication. It is only waves that go upward from the transmitter and downward to the receiver that travel long distances. They strike the Kennelly Layer and are deflected from it back to earth at an angle. All the experts agree that this angular travel of the waves is inevitable in short wave long distance communication.

The claims are for methods of using horizontally polarized waves. However, the case revolves about the use of horizontally disposed transmitting and receiving antennas. Horizontally disposed transmitting antennas radiate horizontally polarized waves and horizontally positioned receiving antennas receive the horizontal component of scrambled waves to the exclusion of vertically polarized waves. But the claims did not involve any apparatus except such as was well known and the means described for projecting and receiving horizontal waves were old in the art.

As plaintiff construes it, this patent would prevent the art from using in long distance communication either the hori-

zontally disposed short wave transmitting antennas or the horizontally disposed short wave receiving antennas now in general use.

The art was using horizontally disposed transmitting and receiving antennas long before this alleged invention of Fessenden. The long distance short wave communication system alleged to infringe the patent was fully developed and in use before issuance of the patent in suit. There is no evidence of any teaching whatever to the art by this patent, or by Fessenden. The only advantage incident to the use of the horizontal polarization is that such waves are sent or received by horizontally arranged antennas. There are structural and mechanical advantages in the use of horizontal antennas, because they are cheaper to erect and maintain. There is no claim to antenna structure in this patent. Kelly admits that the structural advantages and economies of horizontal antennas were known to prior art.

There is an additional advantage incident to the use of a horizontal receiving antenna. Such antenna will discriminate against vertically polarized locally produced "man-made noises". This exclusion of undesired signals of opposite polarization, by arranging an antenna to exclude waves having one polarization, was old and well known in the art.

Two patents discussed by Hogan were granted many years before this Fessenden patent. They showed systems by which one station would set up a vertical antenna and another would set up a horizontal antenna. Then a receiver could be built which could be shifted from vertical to a horizontal position. In that way you could listen to either station. The use of a horizontal antenna to exclude vertically polarized signals, or a vertical antenna to exclude horizontally polarized signals was old and well known in the art.

From the record of this case the court finds as a fact that the prior art covers everything disclosed in the second patent.

Finding both patents invalid the bill of complaint must be dismissed.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.